[No. C061019. Third Dist. Aug. 23, 2010.]

WORLDMARK, THE CLUB, Plaintiff and Appellant, v.
WYNDHAM RESORT DEVELOPMENT CORPORATION, Defendant and
Appellant;
ROBIN MILLER, Defendant and Respondent;
CLARKE WIXON et al., Interveners and Respondents.

1018

## COUNSEL

Romero, Park & Wiggins, H. Troy Romero; Baker Hostetler, Peter W. James, Thomas D. Warren and Lisa I. Carteen for Plaintiff and Appellant.

Snell & Wilmer, Richard A. Derevan, Steven T. Graham and Todd E. Lundell for Defendant and Appellant.

Robin D. Miller, in pro. per., for Defendant and Respondent.

Girard Gibbs, Jonathan K. Levine and Elizabeth C. Pritzker for Interveners and Respondents.

## OPINION

`BLEASE, Acting P. J.—California's Corporations Code grants members of a nonprofit mutual benefit corporation the right to inspect and copy, or obtain for a reasonable charge, the record of the names, addresses, and voting rights of the members of the corporation upon 10 business days' written notice, provided it is for a purpose reasonably related to the person's interest as a member. (Corp. Code, § 8330, subd. (a)(1), (2).)[1] Such a record may be kept in electronic form. (§ 8320.) A record that is "written" includes an "electronic communication[]" (§§ 5079, 8310) and an electronic communication includes an e-mail. (§§ 5079, 20.)

Appellant WorldMark, The Club (WorldMark), is a California nonprofit mutual benefit corporation owned by its more than 260,000 members. It owns vacation time-share resorts throughout North America, including California, and the Pacific. Appellant Wyndham Resort Development Corporation (Wyndham) is an Oregon corporation that manages the operations of WorldMark's resorts pursuant to a management agreement.

A WorldMark member, respondent Robin Miller, invoked section 8330 to demand that WorldMark "make available" to its members a petition proposing amendments to the corporation's bylaws. When WorldMark refused to do

---

[1] Further references to a section are to the Corporations Code unless otherwise indicated.

so, Miller demanded a right to inspect and copy WorldMark's membership records, including the e-mail addresses of its members, for the purpose of distributing his petition to amend the bylaws. E-mail is one of the methods that WorldMark uses to communicate with its members. When WorldMark denied the demand, it proposed the use of a third party mail house to send the petition by conventional mail as a "reasonable alternative" that achieved the purpose identified in Miller's demand. (§§ 8330, subds. (b) & (c), 8331, subd. (a).)

When Miller refused, WorldMark petitioned the superior court to set aside Miller's demand (§ 8331, subd. (a)) on the ground it had satisfied its statutory obligations in proposing an alternative (§ 8330, subd. (b)(1)). The trial court denied the petition because the alternative was not reasonable, as it was too costly, and ordered WorldMark to allow Miller to inspect and copy WorldMark's membership register, including the names, addresses, e-mail addresses, telephone numbers, and voting rights of its members. (§ 8331.) This appeal followed.

WorldMark's primary contention is that there is no statutory authority for the trial court's order requiring it to produce its members' e-mail addresses. We shall conclude that the term "members' . . . addresses," in section 8330, subdivision (a)(1), which a corporation is required to disclose, is sufficiently broad to encompass e-mail addresses in light of the section's purpose and in light of allied sections that allow a corporation to communicate with its members for the purpose of the corporation's business.

We shall modify the trial court's order to provide that the information Miller seeks may be made available to him electronically at his option, that no further written demand is necessary, and affirm the order as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

WorldMark is a California nonprofit mutual benefit corporation. It is owned by its more than 260,000 members. WorldMark owns vacation time-share resorts in California and throughout North America and the Pacific. WorldMark members own credits, rather than a fractional ownership interest in a particular resort.

Wyndham is an Oregon corporation that manages the operations of WorldMark's resorts pursuant to a management agreement. All of WorldMark's properties were purchased and developed by Wyndham. Wyndham transferred ownership of the resorts to WorldMark, and retained

the exclusive right to market and sell the original credits created by the development of each resort. WorldMark members may also advertise, sell, and transfer their credits to others.[2] Other companies also compete with Wyndham for the resale of existing time-share credits.

Miller's first attempt to contact other WorldMark members is evidenced by a letter dated August 8, 2008, addressed to the WorldMark board of directors. Enclosed with the letter was a membership petition with proposed resolutions attached. Miller requested that the board make the petition available to the membership via WorldMark's e-mail list in order to have the measures voted on at WorldMark's annual meeting, which was scheduled to be held on October 23, 2008. Miller did not request a list of WorldMark member e-mail addresses, but merely requested that the board distribute his petition via e-mail. Miller indicated that by including the measures at the board's annual meeting, the significant expense of calling a special meeting would be avoided.

Miller's proposed petition expressed a concern over the domination of WorldMark's board of directors by current or former Wyndham executives, the failure to conduct meetings at which member motions could be raised and voted upon, the absence of any independent owners on the board, and the lack of meaningful member representation in the governance of WorldMark. The proposed resolutions would, if passed, revise WorldMark's bylaws to address these concerns.

The response to Miller's letter came from Stephanie Aardal, WorldMark's director of board and owner relations. Aardal's letter stated that Miller's request did not comply with section 3.3(c) of WorldMark's bylaws requiring a written request signed by members holding 5 percent of the voting power.[3] Miller's request was declined.

---

[2] The Wixons are named plaintiffs in a federal class action against Wyndham. Their federal complaint alleges that an active resale market in WorldMark credits has arisen with the advent of the Internet, and that because the price of resale credits is typically lower than the price of credits purchased from Wyndham, Wyndham has suffered a negative impact on its sales. As a result, they allege, Wyndham has instituted certain programs that destroy the resale market for credits and have a negative impact on WorldMark members.

[3] Section 3.3(c) of WorldMark's bylaws, entitled "Special Meetings" states: "Special meetings of the Members for any lawful purpose and at any time shall be scheduled in response to a call by the President, by the Board, or upon receipt of a written request signed by Members holding five percent (5%) of the Voting Power held by Members other than Declarant. Such meetings must be duly noticed and held not less than thirty-five (35) days nor more than ninety (90) days after request therefore is received by the President or Secretary. If notice is not given by the Secretary within twenty (20) days of such receipt by the Club of a request for special meeting, then the person(s) requesting the meeting may give notice."

Miller's initial request was not directed at a special meeting of the Board. Moreover, section 8330 imposes no such limitation upon a member's request.

Miller sent a second letter on August 25, 2008. He urged the board to reconsider, and noted that the board could call a meeting without obtaining any signatures, and he was requesting that the board do so. He also noted that no signatures were required to distribute his petition to the membership.

Aardal answered Miller's letter, and again informed him that it was his responsibility to gather the minimum 5 percent owner support to bring the petition to the membership. Aardal stated that the board would take appropriate action when he submitted the names of those signing the petitions and copies of the original signed petitions, provided he had received a valid number of signatures.

Miller responded by letter (his third) on September 9, 2008. Since the board refused the request to distribute his petition, he gave notice that he wanted an opportunity within five days to personally inspect WorldMark's membership records, including its e-mail list. He acknowledged that he would use the information only to distribute his petition.

Instead of scheduling an opportunity for Miller to inspect the membership register as provided in the WorldMark bylaws, Aardal wrote back to Miller informing him that the membership register did not include e-mail addresses, and enclosing a copy of WorldMark's "Policies and Procedures" regarding the inspection of WorldMark's membership roster. The Policies and Procedures were approved by WorldMark's board of directors, but were not part of the bylaws.

The document stated that the policy of the board was that members not be allowed to inspect or copy the membership roster "because of privacy concerns and because [of] the roster's tremendous commercial value . . . ." Instead, the board would provide a "reasonable alternative as provided by California law." The alternative procedure required that the member deliver to WorldMark's offices a copy of the materials he or she desired to be sent to the other members. If WorldMark determined that the content was not commercial in nature and was reasonably related to the affairs of the corporation, it would contact the member demanding payment for WorldMark's cost of providing the information, then upon receipt of payment, would provide the member with the name of a mail house to contact in order to arrange the mailing of the materials at the owner's expense.

Miller sent a fourth letter on September 26, 2008, and for the first time referenced section 8330. The letter stated in part:

"Notwithstanding the Club's refusal to acknowledge the hundreds of member signed Petitions submitted over the past month, you've been made

amply aware of the substantial owner voting power endorsing this Petition and supporting its distribution to the membership.

"Be advised that this demand for membership access has been endorsed by WorldMark owners holding voting rights well in excess of the 'authorized number' specified in section 5036 of the California Corporation[s] Code. Be further advised that pursuant to section 8330 of that Code the undersigned, individually & collectively, hereby demand access to the Club's records of the member names, voting rights and corresponding e-mail addresses for personal inspection & copying at the Redmond office within five (5) business days from the date of this communication. Further evidence of endorsement is now being executed and sent to your attention.

"The purpose for the requested information is to enable a timely & cost effective electronic distribution of the Membership Petition prior to the Annual Meeting set for October 23, 2008."

On October 7, 2008, the WorldMark board of directors sent Miller a letter detailing its "serious concerns about the detrimental effect the petition measures would have on the Club if implemented."

On October 10, 2008, Miller went to WorldMark's offices in Redmond, Washington, and presented WorldMark with a list of members purporting to constitute the authorized number to make a demand under section 8330. Miller demanded the e-mail addresses of the members.

On October 15, 2008, Aardal sent Miller a letter acknowledging the receipt of the signed membership petitions, but rejecting Miller's request to disclose e-mail addresses. Aardal stated this time that the e-mail addresses were owned by Wyndham, and that Wyndham "strenuously" objected to their production. The letter stated that it would "take some time" to determine whether the petitions submitted by Miller satisfied the authorized number of members. WorldMark again proposed the alternative of providing the membership list to a mailing house, which would distribute the petitions, and further agreed to pay 50 percent of "the costs associated with administering the mailing, including processing, presorting, addressing and delivering your mailing" to the post office. Miller would, however, be responsible for providing the finished printed materials and paying the postage.

On October 22, 2008, Miller sent a fifth letter to WorldMark. He rejected the alternative WorldMark offered because (1) it was not responsive to his stated objectives, (2) it lacked the efficiency of e-mail communication, (3) it

lacked the cost-effectiveness of e-mail communication, (4) the cost of the alternative was unreasonable, and (5) the alternative could not achieve the stated objectives in a timely manner. Miller again demanded compliance with his request, referencing section 8331.

The same day (Oct. 22, 2008) WorldMark filed its petition under section 8331 to set aside the demand for inspection and copying. The petition alleged WorldMark had offered Miller a reasonable alternative, but that he had rejected the alternative and "escalated" his demand to include e-mail addresses. WorldMark alleged (1) Miller had not satisfied the requirements of section 8330 in submitting his request, (2) e-mail addresses were not part of the membership list, therefore not subject to disclosure under section 8330, subdivision (a)(1), (3) WorldMark did not own the e-mail address list, (4) WorldMark believed the e-mail addresses would be used for an improper purpose, and (5) the alternative proposed by WorldMark was reasonable.

On October 27, 2008, the trial court set a hearing and stayed the production of any information pending the hearing. It was, of course, impossible at this point to get any information to the membership in advance of the October 23, 2008, meeting. On October 30, 2008, the Wixons filed a motion for leave to intervene, and applied to stay the hearing pending a ruling on their motion. The Wixons asserted that they were plaintiffs in a class action against Wyndham in federal court. The federal action alleged, inter alia, that WorldMark directors refused to provide WorldMark members who were attempting to mount a proxy drive with access to the WorldMark membership register, and that this was part of a long effort to manipulate WorldMark board elections to ensure Wyndham's continued domination of WorldMark.

The trial court denied interveners' application to stay the hearing, stating that interveners' rights would not be affected by disposition of the case, since it bore only on Miller's rights. However, the trial court granted the motion to intervene.

On January 23, 2009, the trial court denied WorldMark's application for a protective order, and ordered WorldMark to make the membership register, including names, addresses and e-mail addresses, telephone numbers, and voting rights available for inspection and copying.

WorldMark appealed the order, and petitioned this court for a stay of the trial court order pending appeal. This court initially granted the stay pending appeal. However, Miller and the Wixons moved to vacate the stay after WorldMark placed a ballot proposal before its membership seeking to retroactively amend the bylaws to authorize WorldMark to respond to any

request to inspect and copy the membership register by distributing the member's message through a mail house or other third party distributor.

In response to the motion to vacate, this court modified the stay to permit enforcement of the trial court's order except insofar as the order required that e-mail addresses be subject to disclosure.

Five days after we modified the stay, the attorney for interveners sent a letter to WorldMark formally demanding production in electronic form of the membership register, including names, addresses, and telephone numbers.[4]

WorldMark responded to interveners by letter from its counsel refusing the demand. The excuses given were that (1) the trial court order required only inspection and copying, not production in electronic form, (2) the attorney's representation that the information would not be used for an improper purpose was insufficient, (3) the letter did not specify the purpose of the request, and (4) the member had not given reasonable notice. The letter further stated that WorldMark had "grave concerns about the process it has been afforded in the Court of Appeal," and that notwithstanding its bylaw provisions, "WorldMark's constituent documents do not permit WorldMark to disclose the Membership Register because of the coalescence of the Bylaws and the laws of other states where WorldMark has members and properties."

On November 19, 2009, Miller personally sent a letter to WorldMark renewing his demands for access to the membership list, including the mailing addresses, voting rights and telephone numbers of the members. He reiterated his declaration that he would comply with all restrictions on terms of use of the information as contained in the bylaws and ordered by the court.

WorldMark responded to Miller's letter by letter from its counsel advising Miller that there were "significant new facts and circumstances" bearing on his request. The letter referenced a Florida judgment prohibiting the copying and distribution of the names, addresses, or e-mail addresses of any WorldMark members without their consent. The letter further stated that since Miller had made several requests for information, none of which complied with the bylaws, WorldMark did not know to which request to respond. It further stated Miller had not complied with the conditions of the trial court order.

The Florida judgment to which WorldMark referred was entered in a case filed by five WorldMark members, and referenced a Florida law prohibiting the disclosure of the names, addresses, or e-mail addresses of any members.

---

[4] Respondents' request for judicial notice is granted.

WorldMark filed its answer to the Florida complaint two days after the complaint was filed, and essentially admitted all the allegations of the complaint.[5] In response to the Florida plaintiffs' motion for judgment on the pleadings, WorldMark submitted no vigorous opposition, but specifically referenced the California action against Miller and indicated that without a judicial declaration under Florida law it might be compelled to produce the membership register under order of the California court. Accordingly, a final judgment was entered in the Florida matter granting the plaintiffs a permanent injunction from the production of WorldMark's membership register. The Florida judgment was entered on November 4, 2009, a mere nine days (seven business days) after the action was filed.

## DISCUSSION

## I

## Rights of Inspection

█ Section 8330 provides that a member of a mutual benefit corporation has the right to "[i]nspect and copy the record of all the members' names, addresses and voting rights, at reasonable times, upon five business days' prior written demand upon the corporation which demand shall state the purpose for which the inspection rights are requested . . . ." (§ 8330, subd. (a)(1).) A member may also "[o]btain from the secretary of the corporation, upon written demand and tender of a reasonable charge, a list of the names, addresses and voting rights of those members entitled to vote for the election of directors . . . . The demand shall state the purpose for which the list is requested. The membership list shall be made available on or before the later of ten business days after the demand is received or after the date specified therein as the date as of which the list is to be compiled." (§ 8330, subd. (a)(2).)

The corporation may deny a member or members access to the list if it "reasonably believes that the information will be used for another purpose, or where it provides a reasonable alternative pursuant to subdivision (c) . . . ." (§ 8330, subd. (b)(1).)[6]

---

[5] WorldMark stated it had no knowledge of some of the allegations.

[6] Subdivision (c) of section 8330, states in full: "The corporation may, within ten business days after receiving a demand under subdivision (a), deliver to the person or persons making the demand a written offer of an alternative method of achieving the purpose identified in said demand without providing access to or a copy of the membership list. An alternative method which reasonably and in a timely manner accomplishes the proper purpose set forth in a demand made under subdivision (a) shall be deemed a reasonable alternative, unless within a reasonable time after acceptance of the offer the corporation fails to do those things which it

Both sections 8330, subdivision (b)(1) and 8331, subdivision (f) provide that in any subsequent action to enforce the rights of a member to inspect membership records of the corporation, the corporation has the burden of proving that the member will allow use of the information for purposes unrelated to the person's interest as a member or that the alternative method it proposes will reasonably and in a timely manner achieve the purpose set forth in the demand.

Thus, in reviewing the trial court's order, we must determine (1) whether the trial court's determination that the member will not permit the membership list to be used for an improper purpose is supported by substantial evidence, and (2) whether the alternative proposed by the corporation was reasonable.

### A. Substantial Evidence Supports Miller's Proper Purpose

The trial court's order is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of the correctness of the order. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm v. Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231].) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings. [Citation.] [¶] It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 [23 Cal.Rptr.2d 482].)

Miller repeatedly asserted in his communications to WorldMark his intent to use the membership information solely to contact other members regarding his proposed petition to amend the corporation's bylaws. WorldMark's contrary evidence consisted of its claim that Bill Stephan, one of the 36 members who signed an endorsement of Miller's petition, was the director of sales and marketing for a company in direct competition with Wyndham.

---

offered to do. Any rejection of the offer shall be in writing and shall indicate the reasons the alternative proposed by the corporation does not meet the proper purpose of the demand made pursuant to subdivision (a)."

Inherent in the trial court's ruling was the finding that WorldMark's speculation in this regard was not sufficient to meet its burden of proving that "the member will allow use of the information for purposes unrelated to the person's interest as a member . . . ." (§ 8330, subd. (b)(1).) Miller's representations regarding his intent to use the information solely for a proper purpose constitutes sufficient evidence to support the trial court's finding on that issue.

B. *The Alternative Was Unreasonable*

The trial court made several findings with respect to the reasonableness of the alternative presented by WorldMark. It found that the cost to Miller of the proposed alternative would be $1 per member for alternative mailing, resulting in a cost of over $260,000.[7] It also found the alternative did not comport with section 7.1 of WorldMark's bylaws, which provides that the membership register shall be made available to any member for inspection and copying upon reasonable notice. The trial court found that the Policies and Procedures for requests to inspect and copy the membership register passed by the board were a violation of the bylaws and had not been shown to be in compliance with the provisions for modification of the bylaws.

In determining whether the alternative offered by WorldMark was reasonable, we look to the purposes of the statutory scheme, as well as the purpose of Miller's request. The obvious purpose of the statute is twofold: to allow members access to the membership list for purposes related to their interests as members, and to protect the sensitive nature of a nonprofit corporation's membership lists.

The comments based on the legislative committee summary to section 6330, which deals with public benefit nonprofit corporations and which contains language virtually identical to section 8330, states in part:

"A danger exists in allowing too free an access to membership lists; however, the potential for abuse must be balanced against a member's legitimate needs and rights to utilize lists in election contests and for purposes reasonably related to a member's interest.

---

[7] WorldMark argues for the first time in its reply brief that Miller never tendered evidence that the cost of mailing under the alternative would be at least $260,000. Arguments raised for the first time in the reply brief are untimely and may be disregarded. (*Hernandez v. Vitamin Shoppe Industries Inc.* (2009) 174 Cal.App.4th 1441, 1461, fn. 10 [95 Cal.Rptr.3d 734].) In any event, we may take judicial notice under Evidence Code section 452, subdivision (h), that the current cost of a first-class stamp is 44 cents, thus for postage alone (not including the cost of paper, copying, sorting, and handling) the cost to mail 260,000 first-class letters would be $114,400, an amount that is still prohibitive for the average member.

"The old nonprofit law allowed one member to gain access to a membership list for a purpose reasonably related to the member's interest as a member. However, a member had to bring suit to enforce this right if the corporation refused to provide the list. The new nonprofit law adopts the former law as to the rights of a single member except that it allows the corporation to provide a 'reasonable alternative.' . . .

". . . The committee felt that the above provisions would draw a proper balance between a member's need for adequate access to membership lists and the need of a corporation to protect itself from wrongful exploitation of an important asset." (Coms. Based on Legis. Com. Summary, Deering's Ann. Corp. Code (2009 ed.) foll. § 6330, p. 209.)

We derive from Miller's numerous requests that in addition to wanting the membership list for the proper purpose of contacting the membership about bylaw changes, he specifically requested e-mail addresses in order to distribute his materials in an inexpensive and timely manner, so they could be considered at the annual meeting of the WorldMark board scheduled to occur approximately two and one-half months after his first request.[8] The process proposed by WorldMark would have served its own interest in protecting the membership list, but would have failed to satisfy either of the interests asserted by Miller.

■ The cost of contacting and distributing information to other members is a legitimate factor in determining the reasonableness of any alternative. It is especially pertinent to the consideration of this case, where the membership of the corporation is extremely large, making the cost of contacting the other members by conventional mail such a significant factor that, as a practical matter, a member is completely prohibited from attempting to contact other members for corporate business. The costs go even higher when a third party is paid to physically sort, copy, and mail the information.

The proposed alternative also would not have accomplished Miller's purpose in a timely manner. Although Miller sent his original request some two and one-half months prior to the annual meeting, WorldMark did not propose its alternative until October 15, 2008, only eight days before the scheduled meeting.[9] At that point the only way to transmit the information in a timely manner was electronically.

---

[8] Although Miller's purpose of contacting the membership prior to the 2008 annual meeting can no longer be accomplished, his purpose of having his proposed bylaw amendments distributed to the membership and put up for a vote may still be accomplished at a future meeting.

[9] Section 8330, subdivision (c) provides that the "corporation may, within ten business days after receiving a demand . . . deliver to the person or persons making the demand a written

WorldMark argues that the trial court erred in assuming that member e-mail addresses were required to be produced under section 8330. WorldMark reasons that the cost of mailing the information through a third party mail house would not have been significantly more expensive than Miller's cost of mailing the information himself, especially since WorldMark offered to share the cost associated with using the mail house.

However, we shall conclude in the next part that the language of section 8330, read in the light of allied sections, is sufficiently broad to encompass e-mail addresses in light of the obvious purpose of the statute. Thus, in determining what constituted a reasonable alternative for purposes of sections 8330 and 8331, the trial court could consider options that involved the electronic transfer of the information to the members, including e-mail.

## II

### E-mail Addresses

WorldMark argues it had no obligation to disclose the e-mail addresses of its members because neither section 8330 nor its own bylaws required it to do so, and because it does not own the membership roster, which it claims is owned by Wyndham.

WorldMark's claim that e-mail addresses are not part of its membership register, if accurate, is relevant only to its disclosure requirements under its own bylaws, since section 8330 et seq., do not include the term "membership register." Even if e-mail addresses are not considered part of the membership register under WorldMark's bylaws, this fact would not invalidate WorldMark's obligation to disclose the e-mail addresses as required by statute or under other terms of its bylaws.

Section 7.1(a) of the WorldMark bylaws states that the "Membership register (including mailing addresses and telephone numbers)" must be made available for inspection and copying by any member. However, in addition to the membership register, WorldMark must also make available its articles, bylaws, declaration, rules, books of account, minutes of proceedings, "*and all other records of the Program maintained by the Club or its Manager . . . .*" (§ 7.1(a), italics added.) This inclusive language is broad enough to encompass the e-mail addresses of its members.

---

offer of an alternative method of achieving the purpose identified in said demand without providing access to or a copy of the membership list."

Moreover, as indicated, section 8330 provides for the disclosure of the members' names, addresses, and voting rights. WorldMark argues that this language does not include e-mail addresses because the statute was enacted in 1978, and at the time it was passed the Legislature did not contemplate the inclusion of e-mail addresses. We disagree.

■ Although section 8330 has not been amended since its enactment, allied sections within the statutes governing nonprofit corporations have been amended since the advent of electronic mail.[10] The ultimate purpose of these amendments is to allow electronic communication for the purpose of communicating with shareholders regarding the corporation's business.

Thus section 8320 was amended in 2004, as part of legislation providing for the use of electronic communications, to provide that the "record of [the corporation] members . . . their names and addresses and the class of membership held by each . . . [¶] . . . shall be kept either in written form or in any other form capable of being converted into clearly legible tangible form . . . ." (*Id.*, subds. (a) & (b); Stats. 2004, ch. 254, § 27.) The distinction between a tangible form and one that is not, clearly includes an electronic form that can be made into a tangible form. This reading is supported by the simultaneous enactment of sections 8321 and 8322, which allow certain financial information of the corporation to be distributed annually via "electronic transmission by the corporation (Section 20)." (Stats 2004, ch. 254, §§ 28, 29.)

■ In the same enactment, section 5079, which applies to section 8330 by virtue of section 5002, was amended to provide that the term "[w]ritten" includes "an electronic transmission by a corporation that satisfies the requirements of Section 20." (Stats. 2004, ch. 254, § 13.)[11] Section 20 specifically includes electronic mail within the definition of an electronic transmission.[12]

---

[10] Both parties also point to the Vacation Ownership and Time-share Act of 2004 (Bus. & Prof. Code, § 11210 et seq.). WorldMark cites it to show that the language is similar to that of the Corporations Code, and does not specify e-mail addresses. Respondents cite it to show more expansive language which they contend would include e-mail addresses. Neither party contends the time-share act is applicable here.

[11] " 'Written' or 'in writing' includes facsimile, telegraphic, and other electronic communication as authorized by this code, including an electronic transmission by a corporation that satisfies the requirements of Section 20." (§ 5079.)

[12] Section 20 provides: " 'Electronic transmission by the corporation' means a communication (a) delivered by (1) facsimile telecommunication or electronic mail when directed to the facsimile number or electronic mail address, respectively, for that recipient on record with the corporation, (2) posting on an electronic message board or network which the corporation has designated for those communications, together with a separate notice to the recipient of the posting, which transmission shall be validly delivered upon the later of the posting or delivery

WorldMark points to other statutes that specifically reference both addresses and electronic mail addresses, and argues that these indicate the Legislature made a deliberate choice to exclude e-mail addresses from section 8330. For example, Civil Code section 1798.91, subdivision (a)(2) defines individually identifiable information to mean information that "includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the individual's name, *address, electronic mail address*, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the individual's identity." (Italics added.)

■ However, the term "address" as used in section 8330 is sufficiently broad to include e-mail addresses. ■ Even before the advent of the Internet and electronic mail, the term "address" was defined as "[t]he location at which a particular organization or person may be found or reached." (The American Heritage Dict. (New College ed. 1981) p. 15.) An e-mail address fits within this definition because it is a location, albeit an electronic location, at which a person or organization can be reached. Nothing in the statute limits the term "address" to mean only a physical street address. One could not seriously argue that the term excludes post office boxes. An electronic mail address is nothing more than an electronic post office box.

■ Where, as here, the term used in the statute is susceptible of more than one reasonable interpretation, we may look to the purpose the Legislature sought to achieve and the statutory scheme of which the statute is a part. (*Polster v. Sacramento County Office of Education* (2009) 180 Cal.App.4th 649, 663 [103 Cal.Rptr.3d 291].) The Legislature could not have intended in 1978 that the term "addresses" specifically would include e-mail addresses, since the concept of widespread and instantaneous communication by electronic mail was the stuff of science fiction in 1978. Nevertheless, as noted, the code, of which section 8330 is a part, was amended in 2004 to provide for

---

of the separate notice thereof, or (3) other means of electronic communication, (b) to a recipient who has provided an unrevoked consent to the use of those means of transmission for communications under or pursuant to this code, and (c) that creates a record that is capable of retention, retrieval, and review, and that may thereafter be rendered into clearly legible tangible form. However, an electronic transmission under this code by a corporation to an individual shareholder or member of the corporation who is a natural person, and if an officer or director of the corporation, only if communicated to the recipient in that person's capacity as a shareholder or member, is not authorized unless, in addition to satisfying the requirements of this section, the consent to the transmission has been preceded by or includes a clear written statement to the recipient as to (a) any right of the recipient to have the record provided or made available on paper or in nonelectronic form, (b) whether the consent applies only to that transmission, to specified categories of communications, or to all communications from the corporation, and (c) the procedures the recipient must use to withdraw consent."

electronic communications to and from nonprofit mutual benefit corporations and their members, including specifically e-mail. The purposes implicit in the enactment of the amendments were to provide for the disclosure of records the corporation maintained electronically and to allow the corporation to communicate information to and from its members via electronic mail. (§§ 20, 5079, 8320, 8321, 8322.)

■ Furthermore, the legislative purpose of the statute indicates the Legislature would have intended the inclusion of e-mail addresses in the original statute had it anticipated the existence of such. The comments based on the legislative committee summary indicate the purpose of the statute was to balance a member's legitimate right to contact the membership for election contests or purposes reasonably related to the member's interest, against the potential for abuse in allowing too free an access. (Coms. Based on Legis. Com. Summary, Deering's Ann. Corp. Code, *supra*, foll. § 6330, p. 209.)

The addition of e-mail addresses would do nothing to upset the balance that the Legislature sought to achieve. Such balancing was accomplished by the process of allowing the corporation to propose a reasonable alternative. The use of e-mail addresses to achieve this goal does not affect the balance. Thus, the corporation may either give the list of member e-mail addresses to a requesting member for a proper purpose, or propose an alternative in which it sends the requested information to the membership via e-mail, without disclosing the e-mail addresses to the requesting member.[13]

In this case, because of the extremely large membership and the resulting cost of copying and mailing any kind of communication to each member, denial of the right to contact other members by e-mail effectively denies a member the right to contact other members for a proper purpose. Such a result would unfairly upset the balance sought by the enactment of this legislation, and cannot be a result that the Legislature intended.

---

[13] Our holding does not mean that a corporation will be unable to prevent the disclosure of e-mail addresses or physical mailing addresses in the future. Miller originally presented WorldMark with an alternative that would have satisfied the concerns of both sides—the transmission by WorldMark of Miller's petition via e-mail. This would have accomplished a quick and inexpensive dissemination of the material to the WorldMark membership without necessitating the disclosure of membership information. However, WorldMark rejected the request, and that alternative is no longer at issue here. The important point in terms of the individual member's access, is that in this day and age of instantaneous electronic transmission of data, a corporation may not insist on a slower and more expensive form of communication when a member requests a form of electronic communication and the corporation has the capability of complying with the request.

 The application of an expanded definition of the term "address" to section 8330 fulfills the direction that "courts must be sufficiently receptive to the notion of adapting legal principles to address societal changes brought upon by new technologies, [and] where, as here, the issue involves an interpretation of existing statutes, we must maintain our usual deference to the Legislature in such matters and ask ourselves first how that body would have handled the problem if it had anticipated it. [Citation.]" (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1229 [51 Cal.Rptr.2d 150].) "This is a particularly apt formulation of the standard in cases of emerging technology lest our laws be interpreted only in light of yesterday's accomplishments." (*Id.* at p. 1235.)

We are not persuaded differently by the cases cited by Wyndham, *Citizens for Civic Accountability v. Town of Danville* (2008) 167 Cal.App.4th 1158 [84 Cal.Rptr.3d 684] (*Citizens*) and *InSyst, Ltd. v. Applied Materials, Inc.* (2009) 170 Cal.App.4th 1129 [88 Cal.Rptr.3d 808] (*InSyst*). *InSyst* held that delivery of instructions to obtain an electronic copy of a judgment did not amount to service of a file-stamped copy of the judgment for purposes of triggering the time in which to appeal. (*Id.* at p. 1140.) However, the court indicated that a superior court clerk could electronically serve a triggering document if electronic service had been authorized. (*Id.* at p. 1139.) The court's decision turned on whether an e-mail explaining where to obtain a document was the same as actually transmitting the document. The decision is not helpful to our analysis.

*Citizens, supra,* 167 Cal.App.4th 1158, also involved whether an e-mail from the superior court clerk directing the parties to a Web site where they could find an electronic copy of the judgment was the equivalent of service of a file-stamped copy of the judgment. (*Id.* at p. 1160.) *Citizens* held that the time for appeal was triggered only by the mailing of the judgment via the United States Postal Service. (*Ibid.*) However, the court recognized that the term "mail" was reasonably susceptible of multiple meanings, and resolved the ambiguity by applying the principle that ambiguities should be resolved in favor of preserving the right to appeal. (*Id.* at p. 1163.) That principle is not at play in this case.

We reject WorldMark's claim that it does not "own" the e-mail addresses of its members, but that such addresses are "owned" by Wyndham. WorldMark's bylaws provide that a member may inspect and copy *all* records of the vacation owner program, whether maintained by the corporation or by its manager

(Wyndham).[14] Moreover, Miller presented evidence that WorldMark's online reservation system operated via the e-mail addresses of the participating members, and that its online proxy/ballot voting system also utilizes the members' e-mail addresses. WorldMark may not thwart a member's legitimate attempt to communicate via e-mail by claiming that it does not "own" the addresses of its own members.

## III

### Miller's Demand Satisfied Section 8330

We reject WorldMark's argument that Miller's request did not comply with section 8330, subdivision (b)(2). Subdivision (b)(2) states that the right of inspection and copying may be exercised by "The authorized number of members for a purpose reasonably related to the members' interest as members." The "authorized number of members" is defined in section 5036, which also provides that any right that may be exercised by the authorized number may be exercised "by a member with written authorizations obtained within any 11-month period from members who, in the aggregate, hold the equivalent voting power. Any such authorization shall specify the right to be exercised thereunder and the duration thereof (which shall not exceed three years)." (*Id.*, subd. (d).) WorldMark claims Miller's authorizations were inadequate because they did not specify the duration of the authorization.

However, section 8330 provides that the rights of inspection and copying may be exercised either by a single member or by the authorized number of members. Thus, it was not necessary for Miller to obtain authorizations from any other members in order to exercise his right of inspection and copying.

## IV

### Scope of 8330 Request

WorldMark argues the trial court should not have allowed the Wixons to intervene, or considered WorldMark's bylaws in determining the scope of disclosure in a section 8330 proceeding. We disagree.

We will not reverse the order either because the trial court allowed the Wixons to intervene or because the trial court considered the bylaws when

---

[14] The bylaws provide that a member's access to such documents must be "for a purpose reasonably related to his interests as a Member." Thus, Wyndham's alarm that any member would be able to access the Social Security numbers or consumer credit histories of other members is unfounded.

making its determination. The intervention of the Wixons has no bearing on our determination, and our conclusion that the e-mail addresses must be disclosed is based upon statute, not upon WorldMark's bylaws.

 Finally, WorldMark rejected respondents' postjudgment request for the disclosure of its membership register in electronic form because the trial court order did not require disclosure in electronic form. Our review of the relevant statutory framework indicates that if the records are maintained in electronic form, a member may request that such records be turned over in electronic form. Section 8310 provides that if a record subject to inspection and copying under the statute is not maintained in written form, the corporation must make the record available in written form. That section provides that the terms "written" and "in writing" also include "cathode ray tube and similar electronic communications methods." Section 5079, which has been amended since section 8310 was last amended in 1982, further provides that the terms "[w]ritten" and "in writing" include "facsimile, telegraphic, and other electronic communication as authorized by this code . . . ."

The first sentence of section 8310 provides: "If any record subject to inspection pursuant to this chapter is not maintained in written form, a request for inspection is not complied with unless and until the corporation at its expense makes such record available in written form." Substituting the word "electronic" for the word "written," as both sections 8310 and 5079 indicate we must, we conclude that if a record is maintained in electronic form, the corporation must make the record available in electronic form or written form, at the member's request.

We shall therefore modify the trial court's order to provide for the disclosure of the information in electronic form or written form at the option of respondents. Respondents need not make any further request for information.

## DISPOSITION

The trial court's order is modified to provide that the information Miller seeks, including e-mail addresses, shall be made available to him in electronic form at his option and that no further written demand is necessary. If any member's address is not in electronic form WorldMark shall provide a written copy of such address to Miller. Consistent with the trial court's order, Miller or his duly appointed representative must acknowledge in writing his agreement not to use or allow use of the membership information for commercial or other purposes not reasonably related to the affairs of the club. In all other respects the judgment (order) is affirmed. The stay is vacated upon finality of the judgment.

Costs are awarded to Robin Miller and interveners.

Robie, J., and Cantil-Sakauye, J., concurred.

Petitions for a rehearing were denied September 13, 2010, and on August 25, 2010, the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied December 1, 2010, S186940.