Filed 6/24/21  In re M.M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B308044 |
| | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP00663A) |
| Plaintiff and Respondent, | |
| v. | |
| P.B., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steff R. Padilla, Commissioner.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Mother P.B. appeals the juvenile court's findings under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (the Act) and related California law regarding her son M.M. She claims the Department of Children and Family Services failed to comply with the inquiry provision of the Act.

The Department's inquiry sufficed. We affirm. Undesignated statutory references are to the Welfare and Institutions Code.

I

We review the factual and procedural background.

A

First we describe the proceedings related to M.M.'s removal.

On January 29, 2020, the Department received a referral after M.M.'s friend's parents brought him to a police station. Thirteen-year-old M.M. had been staying with the friend for three days and said his father would not allow him to return home.

The father initially denied not allowing M.M. to return home. He lived with his wife (M.M's stepmother) and their daughter on a military base. He said a court in North Carolina awarded him full physical and legal custody when M.M. was eight years old. He reported M.M. had constant behavioral problems at school, therapy had not helped, his daughter was afraid of M.M., and M.M. was not allowed a key to the home because he would steal. He said M.M.'s mother would "concoct ideas" with M.M. to get him back and had a history of calling the Department to make allegations against the father. The father said he did not know what to do. He "appeared conflicted" and,

2

after consulting with his wife, said he could not have M.M. back in the home.

M.M. said he ran away because his father and stepmother did not want him. He reported abuse by his stepmother and said she would not allow him inside the house and constantly told him to leave. He denied behavioral problems at school and said he was "getting all As." (At detention, M.M. was failing eighth grade.) M.M. said he wanted to live with the mother in North Carolina but knew this was not possible. He said he understood he would go to a foster home and was "okay with that."

The Department contacted the mother by telephone. She confirmed having lost custody of M.M. in 2015 but "has been trying to get [M.M.] back ever since then." The mother has another child who is in the maternal grandmother's custody. The mother has a history of drug use and a criminal conviction for driving under the influence. She denied all previous child services involvement in North Carolina. She said her maternal aunt Sharon B., M.M.'s great-aunt, was willing to care for him.

The Department's report noted the mother "did not seem to be truthful about her history. The mother just kept talking about getting [M.M.] to North Carolina through [the Interstate Compact on the Placement of Children]."

Records from the mother's county in North Carolina indicated she had "an extensive history" with the Department of Social Services there. Between 2005 and 2013, that department received 13 referrals on behalf of the mother's family. A 2015 referral alleged the mother was arrested for solicitation, she left M.M. and his sister by themselves, and she consumed alcohol and cocaine in the children's presence.

On January 30, 2020, the Department detained M.M. On February 3, 2020, it filed a section 300 petition alleging he was at risk due to the father and stepmother's abuse, the father's unwillingness to provide care and supervision, and the mother's criminal conviction and history of drug use.

The juvenile court held a detention hearing on February 4, 2020. It ordered M.M. removed from the parents' care and monitored visits, specifying monitored phone calls for the mother. Afterward, the father "remained adamant that he does not wish to participate in visitation with [M.M.]" and wanted to waive reunification services.

Between the detention hearing and the disposition hearing, the Department had to place M.M. in different homes three times because of problems with M.M.'s and the mother's behavior. The mother made rude comments about caregivers during monitored calls and sent them offensive text messages. M.M. "exhibit[ed] defiant behaviors" including verbal and physical aggression. Caregivers and Department staff reported M.M.'s "behavior often amplifies after telephone contact with his mother" and they "believed that mother has encouraged [M.M.] to misbehave with the [belief] that he would exhaust placements and the Department will return him to her care." M.M. said he wanted to live with his mother and "thinks that if he continues to move placements then the Department will eventually return him to [her]."

Between June and August 2020, the court continued four hearings while it tried to contact a North Carolina court.

On September 16, 2020, the court held a combined adjudication and disposition hearing. The court explained the North Carolina court would not exercise jurisdiction and asserted

jurisdiction in California. The court admitted the Department reports into evidence, heard argument, and sustained the section 300 petition, as amended to strike the physical abuse allegations against the father and stepmother.

The court declared M.M. a dependent and found return to his parents' care, custody, and control would be contrary to his welfare. The father waived reunification services. The court ordered DCFS to provide the mother with reunification services and to investigate placement in her home or the home of the maternal great-aunt, Sharon B.

B

We turn to the proceedings related to the Indian Child Welfare Act. (25 U.S.C. § 1901 et seq.)

Early in the Department's investigation of this referral, the father reported membership in the Occaneechi Band of the Saponi Nation Indians. The mother initially told the Department she did not have any American Indian heritage. Accordingly, the ICWA-010(A) form attached to the section 300 petition documented the father's tribal membership and the mother's report of no Indian background.

At the February 4, 2020 detention hearing, the father provided an ICWA-020 form indicating membership in the Occaneechi tribe and providing his membership number. The court found reason to believe M.M. was an Indian child.

The Department conducted a further interview with the father confirming his membership. The father later provided the Department with a copy of his registration card and information about his family members. The Department then learned the Saponi Nation is not a federally recognized tribe. The Act applies only to federally recognized tribes. (25 U.S.C. § 1903(8); § 224.1,

subd. (a) [adopting federal definitions]; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 786.)

On February 21, 2020, the mother reported her paternal grandmother might have been associated with an Indian tribe. The mother said she did not know her paternal grandmother's name or the name of the tribe. On February 26, the mother provided the Department with her father's and her maternal great-grandmother's obituaries and said the family might have Cherokee Indian heritage.

On February 28, 2020, the Department mailed a notice to three Cherokee tribes and to the Occaneechi Band of the Saponi Nation.

At the June 25, 2020 detention hearing, the mother filed an ICWA-020 form indicating she was a member or might be eligible for membership in a Cherokee tribe. The mother's counsel said the mother "indicates that her grandmother may have been Cherokee." The court ordered the Department to "notify all the appropriate Cherokee nations." At this hearing, the mother's counsel reported the mother was residing in North Carolina with her mother, M.M.'s maternal grandmother.

Counsel for the Department informed the court the Department already sent notice to the Cherokee tribes but had not received return receipts. Counsel reported notice had been sent to the father's tribe, notice had been proper, and that tribe did not respond or intervene. Counsel said it would follow up with the Cherokee Nation and told the mother that if she had additional information, she could provide it to the Department and the Department would follow up.

On June 30, 2020, the Department sent new notices to the Cherokee tribes including information "provided from mother,

maternal grandmother and father." This notice included the maternal grandmother's address, which was the same as the mother's address. The Department received return receipts for all three notices dated July 6, 2020.

The Department received a letter dated June 22, 2020, from the Eastern Band of Cherokee Indians reporting M.M. was not a member or eligible to be a member of that tribe, and he was not considered an Indian child in relation to it.

At the adjudication and disposition hearing on September 16, 2020, the court found the Act did not apply.

III

On appeal, the mother challenges only the adequacy of the Department's inquiry into M.M.'s status as an Indian child under the Act. She describes five problems with the inquiry: (1) the Department did not include the maternal grandmother's address in the February 28, 2020 notice; (2) the Department did not interview the maternal great-aunt; (3) the Department did not include the last known address of the deceased maternal grandfather; (4) the Department omitted some unspecified information; and (5) the Department did not interview the maternal grandmother.

When the facts are undisputed, we independently determine whether the Act's requirements have been satisfied. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051 (*D.S.*); *In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*).)

We review the juvenile court's findings under the Act, however, for substantial evidence. We affirm if "reasonable, credible evidence of solid value" supports the orders and resolve all conflicts in favor of affirmance. (*A.M.*, *supra*, 47 Cal.App.5th at p. 314; *In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin*).)

7

The appellant has the burden to show the evidence was not sufficient to support the findings and orders under the Act. (*Austin*, at p. 885.)

We begin with background about the Act. The Act reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; *Austin, supra,* 47 Cal.App.5th at p. 881.) To that end, the Act established unique standards for the removal and placement of American Indian children. (25 U.S.C. § 1901 et seq.)

Central to the protections of the Act are procedural rules to determine whether an Indian child is involved. To be an Indian child, the child must be either (1) a member of a tribe or (2) a biological child of a member and eligible for membership. (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definitions]; *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520 ["if the child is not a tribe member, and the mother and the biological father are not tribe members, the child simply is not an Indian child"].)

Federal regulations implementing the Act require state courts to ask participants in child custody proceedings whether the participant knows or has reason to know the child is an Indian child. (25 C.F.R. § 23.107(a).) The court must also tell the parties to inform the court if the parties receive information that gives them reason to know the child is an Indian child. (*Ibid.*)

The juvenile court has "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); *In re Dominic F.* (2020) 55 Cal.App.5th 558, 566 (*Dominic*).) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of

8

further inquiry, and the duty to provide formal ICWA notice." (*Dominic*, at p. 566.) Only the second stage is at issue here.

State law lays out requirements for initial inquiry and further inquiry. (*Austin*, *supra*, 47 Cal.App.5th at p. 883.)

Initial inquiry includes the following. The Department must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) At each participant's first appearance at dependency proceedings, the court must ask whether the participant knows or has reason to know the child is an Indian child. (§ 224.2, subd. (c).)

The court and Department social workers must make "further inquiry" if the court or Department has "reason to believe" an Indian child is involved. (§ 224.2, subd. (e).) "Reason to believe" was undefined in the statute until legislative changes took effect on September 18, 2020—two days after the disposition hearing at which the juvenile court found the Act did not apply. (Stats. 2020, ch. 104, § 15.) Section 224.2, subdivision (e)(1), now specifies: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [the child is an Indian child]."

9

The law lays out steps the court and Department must take as "further inquiry," including interviewing parents and extended family members and notifying the Bureau of Indian Affairs and any tribes "that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2); see also Cal. Rules of Court, rule 5.481(a)(4).) Contact with a tribe must include, at minimum, "telephone, facsimile, or electronic mail contact to each tribe's designated agent" and information "necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(2)(C).)

A court's finding there is "reason to know" a child is an Indian child requires formal notice to the tribe. (§ 224.3; see also *Dominic*, *supra*, 55 Cal.App.5th at p. 568.) Sharing information with a tribe at the "further inquiry" stage is distinct from formal notice. (*Dominic*, at p. 567.)

In the present case, the court found there was "reason to believe" M.M. was an Indian child at the initial detention hearing when the father informed it of his Indian heritage. This triggered the duty of further inquiry. The Department accordingly conducted a further interview with the father and obtained more information about his membership and tribe.

When the mother filed a form at the June 25, 2020 hearing documenting her possible Cherokee heritage, the court ordered the Department to "notify all the appropriate Cherokee nations." The Department had already notified those nations, the Bureau of Indian Affairs, and the Secretary of the Interior in February, when the mother initially reported possible Indian heritage. The Department nonetheless sent additional notices with return

10

receipts on June 30, 2020.  One tribe responded and denied M.M.'s status as an Indian child in relation to it.

At the disposition hearing on September 16, 2020, the court properly determined the Act did not apply.

Both parties agree the father is not a member of a federally recognized tribe.

The mother's assertion of Cherokee heritage was " 'vague, attenuated, and speculative.' " (*Austin, supra*, 47 Cal.App.5th at p. 888.)  Nonetheless, the Department conducted a further inquiry and sent notice to three Cherokee tribes.  The Department's counsel asked the mother to pass on any new information, which it promised to investigate.  No tribe intervened and no new information surfaced.

The Department made a good faith effort to gather information about M.M.'s membership status or eligibility.  (See *Dominic, supra*, 55 Cal.App.5th at p. 570.)  "[The Department's] inquiry obligation is 'not an absolute duty to ascertain or refute Native American membership.' " (*Ibid*.)  The Department complied with its "further inquiry" obligations pursuant to section 224.2, subdivision (e) when it identified and notified, with return receipts, three Cherokee tribes.  There was no "reason to know" M.M. was an Indian child under the Act.  (§ 224.2, subd. (d).)

Mother alleges five errors in the Department's inquiry.  We address each in turn.

## A

First, the mother complains the Department did not include the maternal grandmother's address in the February 28, 2020 notices to the Cherokee tribes.  She concedes it included the maternal grandmother's name, birth date, and birth place.  She

11

also concedes the June 30, 2020 notices included the maternal grandmother's address—which, notably, is the same as the mother's address.

The mother does not clarify why her *mother's* residence is relevant to the mother's claim of possible Cherokee heritage through her *paternal* grandmother. The mother provides no citation to case law or statute requiring provision of this peripheral piece of information to comply with the Act.

Regardless, the Department supplied the address later. Its initial oversight, if any, was harmless.

In her reply brief, the mother also notes the Department failed to list former addresses for the mother and maternal grandmother. We disregard an argument raised for the first time in a reply brief. (*WorldMark, The Club v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1030, fn. 7.)

B

The mother next says the Department did not ask maternal great-aunt Sharon B. about M.M.'s possible Indian heritage.

Sharon B. is not a participant in this proceeding. The Department spoke with Sharon B. on February 2, 2020, which was early in its investigation. The mother first reported possible *paternal* Indian heritage nearly three weeks later, on February 21, 2020. Sharon B. is the mother's *maternal* aunt. The Department was not required to interview M.M.'s great-aunt—on an unrelated side of the family—to comply with the Act. (See 25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definitions]; *D.S.*, *supra*, 46 Cal.App.5th at p. 1053 [duty to inquire of extended family members does not include great-grandparents].) The Department "is not required to 'cast about' for information or pursue unproductive investigative leads." (*D.S.*, at p. 1053.)

12

## C

In two sentences, the mother points out the Department did not include the last known address for her deceased father, M.M.'s grandfather, on the notices. The notices included his name, date and place of birth, and date and place of death. The mother does not explain why the omitted address is material. We disregard claims unsupported by argument.

## D

The mother says the Department "gleaned" the dates of death of her father and maternal great-grandmother from obituaries she provided but it "neither included any additional information from the obituaries, nor reported there was none." The mother does not describe what this additional information is or could be, or why the Department should have provided it. Again, we disregard claims unsupported by argument.

## E

Finally, the mother contends the Department did not interview the maternal grandmother. Or, if it did, it did not properly document the interview.

The Act requires the Department to ask extended family members, including grandparents, about possible Indian heritage. (25 U.S.C. 1903(2); § 224.1, subd. (c).) Here, the record indicates the Department *did* ask the maternal grandmother. It reported the June 30, 2020 notices included information "provided from mother, maternal grandmother and father." These notices newly included the maternal grandmother's address. We infer the Department discovered or verified this address after contacting the maternal grandmother.

13

The mother invites us to presume the Department is "being disingenuous" about having contacted the maternal grandmother. We decline.

**DISPOSITION**

We affirm.

WILEY, J.

We concur:

GRIMES, Acting P. J.

STRATTON, J.