Filed 2/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SKYLAR WARD,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>TILLY'S, INC.,<br><br>　　　Defendant and Respondent. | B280151<br><br>(Los Angeles County<br>Super. Ct. No. BC595405) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu Berle, Judge.  Reversed.

　　　McNicholas & McNicholas, Patrick McNicholas and Michael J. Kent; Frank Sims & Stolper and Scott H. Sims; Bridgford, Gleason & Artinian and Michael H. Artinian; Esner, Chang & Boyer, Andrew N. Chang, Holly N. Boyer and Steffi A. Jose for Plaintiff and Appellant.

　　　O'Melveny & Myers, Apalla U. Chopra, Adam J. Karr, Ryan Rutledge, and Briana LaBriola for Defendant and Respondent.

　　　Greenberg Traurig, Mark D. Kemple and Ryan C. Bykerk for Amicus Curiae Abercrombie & Fitch Stores, Inc.

This appeal, which follows an order sustaining a demurrer without leave to amend, concerns the practice of on-call scheduling. As alleged, on-call scheduling works this way: Employees are assigned on-call shifts, but are not told until they call in two hours before their shifts start whether they should actually come in to work. If they are told to come in, they are paid for the shifts; if not, they do not receive any compensation for having been "on call."

Plaintiff Skylar Ward challenges the on-call scheduling practices of her former employer, Tilly's, Inc. (Tilly's), as violating wage order No. 7-2001 (codified at California Code of Regulations, title 8, section 11070; hereafter, Wage Order 7), which regulates the wages, hours, and working conditions in the mercantile industry. Among other things, Wage Order 7 requires employers to pay employees "reporting time pay" for each workday "an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work." Plaintiff contends that when on-call employees contact Tilly's two hours before on-call shifts, they are "report[ing] for work" within the meaning of the wage order, and thus are owed reporting time pay. Tilly's disagrees, urging that employees "report for work" only by physically appearing at the work site at the start of a scheduled shift, and thus that employees who call in and are told not to come to work are not owed reporting time pay.

We conclude that the on-call scheduling alleged in this case triggers Wage Order 7's reporting time pay requirements. As we explain, on-call shifts burden employees, who cannot take other jobs, go to school, or make social plans during on-call shifts—but who nonetheless receive no compensation from Tilly's unless they

2

ultimately are called in to work. This is precisely the kind of abuse that reporting time pay was designed to discourage. We therefore reverse the judgment and remand this case to the trial court for further proceedings.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Underlying Facts*[2]

Tilly's is a California corporation based in Irvine, California. In 2012, plaintiff worked as a sales clerk in a Tilly's store in Torrance, California.

During her employment with Tilly's, plaintiff and other employees were scheduled for a combination of regular and "on-call" shifts (also referred to as "call-in" shifts), which had "a designated beginning time and quitting time." Employees were required to contact their stores two hours before the start of their on-call shifts to determine whether they were needed to work those shifts. Tilly's informed its employees to "consider an on-call

---

[1]    Because the issue is not properly before us at this early stage of the proceedings, we do not consider whether our interpretation of the wage order applies prospectively only, or retroactively as well. (See *Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 443 [retroactive application of holding necessarily involves factual and policy issues not before appellate court on review of a judgment following order sustaining a demurrer].)

[2]    A demurrer admits, provisionally for purposes of testing the pleading, all material facts properly pleaded. (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1247.) Accordingly, we draw our recitation of the facts from plaintiff's operative first amended complaint, the allegations of which we accept as true for purposes of this appeal. (*Fischer v. Time Warner Cable Inc.* (2015) 234 Cal.App.4th 784, 788, fn. 1.)

3

shift a definite thing until they are actually told they do not need to come in."

Tilly's on-call shifts came in "various forms."  For example:

"a.     Employees are scheduled for a regular shift as well as an on-call shift later that same day.  In such instances the employee is required to physically show up for work at the time of her regular shift and is told during her regular shift whether she will also be required to work her on-call shift.  [¶]  Example: Employee is scheduled for a regular shift from 11:00 a.m. to 3:00 p.m. and an on-call shift from 3:00 p.m. to 5:00 p.m.

"b.     Employees are scheduled for on-call shift[s] earlier in the day than . . . regular shift[s] scheduled on that same day.  In such instances the employee is required to call in to work, physically show up to work, or otherwise establish contact with the employer [two] hours before the scheduled on-call shift (or, if the on-call shift is scheduled to begin before 10:00 a.m., a[t] 9:00 p.m. the night before) to determine if [s]he is required to work the scheduled on-call shift.  [¶]  Example:  Employee is scheduled for an on-call shift from 10:00 a.m. to 12:00 p.m. and a regular shift from 12:00 p.m. to 4:00 p.m.

"c.     Employees are scheduled for on-call shifts on days they are not scheduled for . . . regular shift[s].  In such instances the employee is required to call into work, physically show up to work, or otherwise establish contact with the employer [two] hours before the scheduled on-call shift (or, if the on-call shift is scheduled to begin before 10:00 a.m., a[t] 9:00 p.m. the night before) to determine if she is required to work the scheduled on-call shift.  [¶]  Example:  Employee is scheduled for an on-call shift from 10:00 a.m. to 2:00 p.m. with no regular shift that day."

4

Employees were disciplined if they failed to contact their stores before on-call shifts, or if they contacted the stores late, or if they refused to work on-call shifts. Discipline included formal written reprimands and, upon three violations, could include termination. However, Tilly's did not include on-call shifts as part of the employee's "scheduled day's work" when calculating pay unless the employee was required to work the on-call shift; and it did not consider an employee to have "reported for work" if he or she called the store prior to an on-call shift, but was told he or she was not needed.

On-call shifts "take a toll on all employees, especially those in low-wage sectors. Without the security of a definite work schedule, workers who must be 'on call' are forced to make childcare arrangements, elder-care arrangements, encounter obstacles in pursuing their education, experience adverse financial effects, and deal with stress and strain on their family life. The 'on-call' shifts also interfere with employees' ability to obtain supplemental employment in order to ensure financial security for their families."

B.      *The Present Action*

Plaintiff filed a putative class action complaint on September 21, 2015, and filed the operative first amended complaint (complaint) on July 5, 2016. The complaint alleged that Wage Order 7 mandates that non-exempt retail employees be paid "reporting time pay" if either "an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work" or "an employee is required to report for work a second time in any one workday and is furnished less than two (2) hours of work on the second reporting." (Cal. Code Regs., tit. 8,

5

§ 11070, subd. (5).)  The complaint alleged that Tilly's employees were due reporting time pay for on-call shifts, and that Tilly's failure to properly compensate employees for those shifts resulted in violations of Wage Order 7, Labor Code sections 200–203, 226, and 226.3, and Business and Professions Code section 17200.

C.    *Demurrer; Dismissal Order*

Tilly's demurred to the complaint, asserting that it failed to state a cause of action.  It contended that the first cause of action for reporting time pay failed as a matter of law because requiring employees to "call[] in to ask whether to report for work" did not constitute "reporting for work" within the meaning of Wage Order 7.  The second, third, and fourth causes of action were derivative of the first cause of action and, therefore, failed for the same reason.

The trial court sustained the demurrer without leave to amend.  It explained:  "[T]his court is persuaded that Defendant's interpretation of the phrase 'report to work' to mean that an employee physically appears at the workplace is a correct analysis and interpretation.  [¶] . . . [¶] . . . [T]he court finds that by merely calling in to learn whether an employee will work a call-in shift, Plaintiff and other employees do not report to work as contemplated by Wage Order 7.  As such, Plaintiff is not entitled to reporting-time pay under the Wage Order, and the First Cause of Action for failure to pay reporting time pay fails. [¶] . . .  Plaintiff's three remaining claims are derivative of the first and fail for the same reasons."

Plaintiff timely appealed from the dismissal order.[3]

---

[3]    The dismissal order was a "written order signed by the court and filed in the action" and, thus, is appealable.  (Code Civ. Proc., § 581d ["All dismissals ordered by the court shall be in the

6

## STANDARD OF REVIEW

" ' "On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." ' (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 650.) In reviewing the complaint, 'we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable.' (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814.) We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling. (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)" (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 549.)

## DISCUSSION

## I.

## Background

*A.* *Wage Orders and the Industrial Welfare Commission*

In 1913, the Legislature established the Industrial Welfare Commission (IWC) "and—spurred by concerns over inadequate wages and poor working conditions—delegated to the agency authority for setting minimum wages, maximum hours, and working conditions." (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 263 (*Augustus*).) The IWC began issuing industry- and occupation-specific wage orders in 1916, and it revised those wage orders from time to time. (*Id.* at

---

form of a written order signed by the court and filed in the action and those orders when so filed shall constitute judgments and be effective for all purposes, and the clerk shall note those judgments in the register of actions in the case."].)

7

p. 263.)  Although the Legislature defunded the IWC in 2004, its wage orders remain in effect.  (*Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 838, fn. 6 (*Mendiola*).)

Wage orders are issued pursuant to an express delegation of legislative power, and thus they have the force of law. (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 552–553 (*Alvarado*), citing *Martinez v. Combs* (2010) 49 Cal.4th 35, 52–57 (*Martinez*) [setting forth a brief history of the IWC].)  The IWC's wage orders originally applied only to women and children, but since the 1970's they have applied to all employees, regardless of age and gender.  (*Alvarado*, *supra*, at p. 552; Stats. 1973, ch. 1007, § 8, p. 2004; Stats. 1972, ch. 1122, § 13, p. 2156; see also *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700–701 (*Industrial Welfare Com.*).)

The specific wage order applicable in this case is Wage Order 7, which governs "all persons employed in the mercantile industry," other than persons employed "in administrative, executive, or professional capacities."  (Cal. Code Regs., tit. 8, § 11070, subd. (1)(A).)  The "mercantile industry" is "any industry, business, or establishment operated for the purpose of purchasing, selling, or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities."  (*Ibid.*, subd. (2)(H).)[4]

B.     *Interpretive Principles*

Wage orders "are 'quasi-legislative regulations and are construed in the same manner as statutes under the ordinary

---

[4]     Other industries are governed by different wage orders, but many of those wage orders contain similar provisions.  (*Alvarado*, *supra*, 4 Cal.5th at pp. 552–553.)

8

rules of statutory construction.' " (*Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 539–540; *Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 568 (*Aleman*); *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027 (*Brinker*).)  Those rules dictate that we begin by examining the language of the statute (or regulation) itself, giving the words their ordinary and usual meaning.  When the language is clear, "we apply the language without further inquiry." (*Aleman*, at pp. 568–569.)  If the regulation is ambiguous—that is, it is susceptible to more than one reasonable interpretation—we may use " 'a variety of extrinsic aids.  For example, [we] may consider the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  In addition, the court may consider the consequences that will flow from a particular interpretation.  [Citations.]' (*Jewish Community Centers Development Corp. v. County of Los Angeles* (2016) 243 Cal.App.4th 700, 708.)  A court 'construing an ambiguous statute must avoid, if it can, an interpretation that would lead to absurd consequences.' " (*Garcia v. American Golf Corp.* (2017) 11 Cal.App.5th 532, 543.)

When construing wage orders, "we adopt the construction that best gives effect to the purpose of the Legislature and the IWC"—that is, the protection of employees. (*Augustus, supra*, 2 Cal.5th at p. 262, citing *Mendiola, supra*, 60 Cal.4th at p. 840 [" 'to promote employee protection' "]; *Martinez, supra*, 49 Cal.4th at pp. 53–54 [describing the Legislature's concerns]; *Industrial Welfare Com., supra*, 27 Cal.3d at p. 702 [noting the "remedial nature" of legislative enactments and wage orders].)  "In

9

furtherance of that purpose, we liberally construe the Labor Code and wage orders to favor the protection of employees. (E.g., *Brinker*, at pp. 1026–1027; *Murphy* [*v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094,] 1103 ['statutes governing conditions of employment are to be construed broadly'].)" (*Augustus*, *supra*, at pp. 262–263.)  In doing so, we accord the IWC's interpretations " 'considerable judicial deference.' " (*Ibid*.)  We "take account of" enforcement policies of the Division of Labor Standards Enforcement (DLSE), the state agency that enforces wage orders (*ibid*.), but because such policies "are not entitled to deference," we will adopt the DLSE's interpretation only "having independently determined that it is correct." (*Peabody v. Time Warner Cable, Inc*. (2014) 59 Cal.4th 662, 670.)

## II.

## The Wage Order's Plain Language

We begin with the regulation's plain language.  Wage Order 7 requires employers to pay employees reporting time pay, as follows:

"(A)   Each workday an employee is required to *report for work* and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

"(B)   If an employee is required to *report for work* a second time in any one workday and is furnished less than two (2) hours of work on the second reporting, said employee shall be paid for

10

two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

"(C) The foregoing reporting time pay provisions are not applicable when: [¶] (1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or [¶] (2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or [¶] (3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

"(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time." (Cal. Code Regs., tit. 8, § 11070, subd. (5), italics added.)

The present dispute turns on the meaning of "report for work," a phrase Wage Order 7 uses, but does not define. Both parties assert this phrase is unambiguous—but they interpret it in very different ways.

Tilly's argues that "report[ing] for work" requires an employee's *physical presence* at the workplace *at the start of a scheduled shift*. Tilly's says: "[A]n employee only reports for work by being present (reporting) at the start of the shift (for work). That is the plain meaning of Wage Order 7." Thus, Tilly's urges, "the plain meaning of 'report for work' requires an employee to present herself at the start of a shift—not merely to verify the schedule in advance." Amicus Abercrombie & Fitch Stores, Inc. urges us to interpret "report for work" in similar fashion, suggesting that Wage Order 7 requires reporting time pay only "if the employee (1) shows up ('reports') (2) ready for work ('for work')." By thus interpreting "report[ing] for work" to

11

mean physical presence at the work site, amicus asserts the IWC "drew and maintained" a "bright-line rule."

Plaintiff, in contrast, asserts that Wage Order 7 is triggered by any manner of reporting, whether in person, telephonic, or otherwise. She says: "There is no specific language in [the] phrase [report for work] that requires or necessitates that such reporting be physical in nature. In short, the face of the wage order does not include an element requiring that workers physically present themselves at a workplace." Thus, plaintiff urges: "In the modern era, where many workers complete their tasks remotely, use telephones to clock in and clock out for timekeeping purposes, and, check for shifts telephonically, a commonsense and ordinary reading of the order would include the reporting that Plaintiff engaged in in accordance with Tilly's policies."

In our view, the text of Wage Order 7, alone, is not determinative of the question before us. Some dictionary definitions of "report" do, as Tilly's says, have a spatial element— i.e., "to go *to a place* or a person and say that you are there" (Cambridge Dict. <https://dictionary.cambridge.org/us/ dictionary/english/report> [as of Feb. 4, 2019], italics added), or to "[p]resent oneself formally *as having arrived at a particular place* or as ready to do something" (Oxford Dict. <https://en.oxford dictionaries.com/definition/report> [as of Feb. 4, 2019], italics added). Many other definitions, however, focus on the reporter's *intent*, rather than his or her *location*—for example, "to present oneself *as ordered*" (Random House Webster's College Dict. (1992), p. 1142, col. 2, italics added), or "to present (oneself) to a person in authority, as *in accordance with requirements*" (Dictionary.com <http://www.dictionary.com/ browse/report>

[as of Feb. 4, 2019], italics added).  Accordingly, as a purely linguistic matter, it is not obvious whether "report[ing] for work" requires an employee's presence at a particular place (the work site) at a particular time (the start of a shift)—or whether it also may be satisfied by the employee presenting himself or herself *in whatever manner the employer has directed*, including, as in this case, by telephone, two hours before the scheduled start of an on-call shift.  We therefore turn to other interpretive tools for guidance.

### III.
### Regulatory History and Purpose

A.    *Our Interpretation Is Not Limited by the IWC's Understanding of Wage Order 7 At the Time It Was Adopted*

Tilly's and the dissent urge that our interpretation of "report for work" should be governed by the IWC's understanding of the phrase at the time of its adoption in the 1940's—an understanding that did not contemplate employees reporting for work by telephone.  We disagree only in part.  Telephonic reporting requirements appear to be of recent vintage, and, indeed, the cell phone technology that makes such telephonic reporting feasible did not exist until many decades after the reporting time pay requirement was enacted.  We therefore agree with Tilly's and the dissent that " 'at least in 1947, the phrase 'report [for] work' meant physically showing up.' "  (Dis. & conc. opn. of Egerton, J., p. 3, *post*, citing *Casas v. Victoria's Secret Stores, LLC* (C.D. Cal., Dec. 1, 2014, No. CV 14-6412-GW) 2014 WL 12644922, at *4 (*Casas*).)  Put simply, that is how an employee reported for work in the 1940's.

13

The contemporaneous understanding of "report for work" is not dispositive of our analysis, however. To the contrary, our Supreme Court has held in construing statutes that predate their possible applicability to new practices or technology, "courts have not relied on wooden construction of their terms. Fidelity to legislative intent does not 'make it impossible to apply a legal text to technologies that did not exist when the text was created. . . . Drafters of every era know that technological advances will proceed apace and that the rules they create will one day apply to all sorts of circumstances they could not possibly envision.' (Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) pp. 85–86.)" (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 137 (*Apple Inc.*).) Thus, in applying existing statutes to new circumstances, " 'we must maintain our usual deference to the Legislature in such matters and ask ourselves first *how that body would have handled the problem if it had anticipated it*. [Citation.]' (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1229.)" (*WorldMark, The Club v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1036 (*WorldMark*), italics added.)

The Supreme Court applied these principles in *Apple Inc.*, *supra*, 56 Cal.4th 128. There, the court considered whether a provision of the Song-Beverly Credit Card Act (Song-Beverly) that prohibited retailers from requiring credit card holders " 'to write any personal identification information upon the credit card transaction form or otherwise' " applied to *online* retail purchases. (*Id.* at p. 132.) The court noted that Song-Beverly had been enacted in 1990, almost a decade before online commercial transactions became widespread, and thus the Legislature "at the time it enacted [the provision at issue] . . . did

14

not contemplate commercial transactions conducted on the Internet." (*Id*. at pp. 136–137, italics omitted.) That fact, however, "alone [was] not decisive" of the statute's meaning. Instead, the court looked to "the Legislature's purpose in enacting the statute" and "the statutory scheme as a whole" to determine "whether it is applicable to a transaction made possible by technology that the Legislature did not envision." (*Id*. at pp. 138, 139.) Only after doing so did the court conclude that had the Legislature in 1990 "been prescient enough to anticipate online transactions involving electronically downloadable products," it would not have intended Song-Beverly's prohibitions to apply to them. (*Id*. at p. 141.)

The Court of Appeal reasoned similarly in *WorldMark*, *supra*, 187 Cal.App.4th 1017. There, the court considered whether a provision of the Corporations Code that permitted members of a nonprofit mutual benefit corporation to " 'copy the record of all the members' *names* [*and*] *addresses*' " (*id*. at p. 1028, italics added) also entitled members to copy co-members' *e-mail* addresses. The court noted that the Legislature "could not have intended in 1978 that the term 'addresses' specifically would include e-mail addresses, since the concept of widespread and instantaneous communications by electronic mail was the stuff of science fiction in 1978." (*Id*. at p. 1034.) However, the court reasoned, the statute's legislative purpose indicates the Legislature would have intended the inclusion of e-mail addresses in the original statute had it anticipated the existence of e-mail. It explained: "The comments based on the Legislative Committee summary indicate the purpose of the statute was to balance a member's legitimate right to contact the membership for election contests or purposes reasonably related to the

15

member's interest, against the potential for abuse in allowing too free an access. [Citation.] [¶] The addition of e-mail addresses would do nothing to upset the balance that the Legislature sought to achieve. Such balancing was accomplished by the process of allowing the corporation to propose a reasonable alternative. The use of e-mail addresses to achieve this goal does not affect the balance." (*Id.* at pp. 1035–1036.)

As relevant to the present case, Wage Order 7 does not reference telephonic reporting, nor is there evidence that the IWC ever considered whether telephonic reporting should trigger the reporting time pay requirement. To paraphrase our Supreme Court, such an omission "is not surprising" (*Apple Inc.*, *supra*, 56 Cal.4th at p. 136) because neither the practice of on-call scheduling nor the cell phone technology that makes such scheduling possible existed when the IWC adopted the reporting time pay requirement in the 1940's. Consistent with *Apple Inc.* and *WorldMark*, we therefore next consider whether, had the IWC been "prescient enough to anticipate" cell phones and telephonic call-in requirements, it "would have intended" the reporting time pay requirement to apply.[5] [6]

---

[5] Tilly's questions the need for this analysis, urging that the only technology at issue "is the telephone—which has existed longer than Wage Order 7" and was "ubiquitous" when the IWC adopted the reporting time pay requirement in the early 1940's. We do not agree. Although telephones were in use throughout the twentieth century, more than one in five households did not have a telephone available even by 1960, nearly 20 years after the IWC adopted reporting time pay requirements. (United States Census Bureau, Historical Census of Housing Tables: Telephones <https://www.census.gov/hhes/www/housing/census/historic/phone.html> [as of Feb. 4, 2019].) It is reasonable

## B.     *Wage Order 7's History and Purpose*

In 1913, the California Legislature established the IWC to adopt minimum wages, maximum hours, and standard working conditions for the protection of women and minors.[7]  The first

---

to assume that the households that lacked access to telephones disproportionately were made up of low-wage hourly workers, to whom Wage Order 7 applied.  Moreover, cell phones were not in widespread use until the end of the twentieth century or the beginning of the twenty-first century; and even as late as 2011, the Pew Research Center reported that nearly one in five adults did not own a cell phone.  (Pew Research Center, Americans and Their Cell Phones (Aug. 15, 2011) <http://www.pewinternet.org/ 2011/08/15/americans-and-their-cell-phones-3/> [as of Feb. 4, 2019].)

[6]     We respectfully disagree with the dissent's suggestion that by reaching this question, the court is " 'drawing up interpretations that promote the Court's view of good policy.' " (Dis. & conc. opn. of Egerton, J., p. 1, *post*, quoting *Casas*, *supra*, 2014 WL 12644922, at *5.)  As we have said, fidelity to legislative intent "does not 'make it impossible to apply a legal text to technologies that did not exist when the text was created.' " (*Apple Inc.*, *supra*, 56 Cal.4th at p. 137.)

[7]     "To assist the IWC in this work, the Legislature gave the [IWC] broad investigatory powers . . . .  If, after investigation, the IWC determined that the wages paid to women and minors in any industry were 'inadequate to supply the cost of proper living, or the hours or conditions of labor [were] prejudicial to the health, morals or welfare of the workers,' the IWC was to convene a ' "wage board" ' of employers and employees.  (*Id.*, § 5, p. 634.) Based on the wage board's report and recommendations, and following a public hearing, the commission was to issue wage orders fixing for each industry '[a] minimum wage to be paid to women and minors . . . adequate to supply . . . the necessary cost

minimum wage orders were issued in early 1916, and by 1923 minimum wage orders had been adopted to cover most industries. (Dept. of Industrial Relations, Biennium Report (1945–1946) pp. 50–52.)

The IWC revised nearly all of its industry orders in 1942 and 1943. Recommendations to the IWC provided by the Canning and Preserving Industries Wage Board in 1942 described the need for reporting time pay as follows: "Allowing a large number of workers to come to the plant when there is little or no work for them is serious abuse. The testimony [to the Wage Board] showed that able employers through the information collected by their organization eliminated this evil almost entirely. Incompetent employers are able, however, to make the worker pay for their incompetency. It is an obvious advantage to the employer to have plenty of workers around for all emergencies if he does not have to pay for them. . . . [¶] . . . [¶] . . . [Reporting time pay] is a penalty which will make the employers careful to see that there is work and some compensation for the time and expense of the employee in reporting." (Kidd, Chairman, Comment on the Rep. of the Wage Bd. for the Canning and Preserving Industries (July 21, 1942) pp. 8–9.)

Effective June 21, 1943, the IWC adopted revised Wage Order 7, which included a reporting time pay requirement as follows: "Each day an employee is required to report for work and does report for work, but is not put to work or works four (4)

---

of proper living and to maintain [their] health and welfare' (*id.*, § 6, subd. (a), par. 1, p. 634), the maximum hours of work, and the standard conditions of labor (*id.*, subd. (a), pars. 2–3, pp. 634–635)." (*Martinez, supra*, 49 Cal.4th at pp. 54–55.)

hours or less, the employer shall pay the employee for not less than four (4) hours at fifty cents (50¢) per hour . . . ." (IWC meeting mins. (Apr. 5, 1943) pp. 39, 45.)[8] The IWC explained it was necessary to require employers to pay employees who reported but were not put to work because of "the prevalence of such practices, and in order to compensate the employee for transportation costs and loss of time." (*Id*. at p. 34.)

The same year, IWC also revised the wage order governing the housekeeping industry (wage order No. 5) to include a reporting time pay requirement. In connection with the revision, the IWC considered an employer request that employees who resided at the workplace be paid only two hours of reporting time pay, rather than the proposed four hours, because such employees "do[] not lose the usual time going to and from the place of employment." (IWC meeting mins. (Feb. 5, 1943) p. 6.) The IWC rejected the proposal, adopting a four-hour reporting time pay requirement for both resident and non-resident employees. (*Id*. at p. 26.) Subsequently, the IWC issued a ruling addressing whether the reporting time pay provision applied to resident employees; the IWC unanimously ruled that the four-hour reporting time pay requirement applied to both resident and non-resident employees. (IWC meeting mins. (Sep. 11, 1943) p. 18.)

The IWC adopted the current reporting time pay provision of Wage Order 7 in 1979. In addition to the original language (which was designated § (5), subdivision (A)), the IWC added

---

[8] This provision was revised in 1947, to replace "at fifty cents (50¢) per hour" with the phrase "at the employee's regular rate of pay, which shall be not less than the minimum wage herein provided." (IWC meeting mins. (Feb. 8, 1947) p. 91.)

19

three new provisions, which stated that employees were entitled to two hours of reporting time pay if they were required to report for work a second time in one workday but were furnished less than two hours of work (subd. (B)); reporting time pay was not owed if operations could not commence for enumerated reasons beyond the employer's control (subd. (C)); and reporting time pay "shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time" (subd. (D)). (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement, Public Meeting to Adopt Revised Orders (Sep. 7, 1979) pp. 1–2, 5, 23–24, 127–129.) The IWC explained that "[t]he requirement for reporting time pay historically has been included in the commission's orders on the basis that it is necessary to employee[s'] welfare that they be notified *in advance* when changes in their starting time must be made. It has been deemed a [maximum] of four hours' pay adequate to encourage *proper notice and scheduling*. [¶] The commission received no compelling evidence, and concluded there was no rationale to warrant making any change in the provisions of this section, which date back to 1942." (*Id.* at pp. 55–56, italics added; see also *id.* at pp. 127, 129–130.)

This history thus reveals, as our Supreme Court has said, that the IWC's purpose in adopting reporting time pay requirements was two-fold: to "compensate employees" and " 'encourag[e] proper notice and scheduling.' " (*Murphy*, *supra*, 40 Cal.4th at pp. 1111–1112.)[9] With these twin goals in mind, we

---

[9] These twin goals have repeatedly been reflected in enforcement guidance provided by the Department of Industrial Relations (DIR) and the DLSE. The DIR noted in a 1965

20

turn to the question before us—whether, had the IWC considered the issue, it would have concluded that telephonic call-in requirements trigger reporting time pay.

C. *The Wage Order's History and Purpose Are Consistent With Requiring Reporting Time Pay for On-Call Shifts*

We conclude that had the IWC confronted the issue, it would have determined, as we do, that the telephonic call-in requirements alleged in the operative complaint trigger reporting time pay. We note as an initial matter that the on-call practices plaintiff alleges have much in common with the specific abuse the IWC sought to combat by enacting a reporting time pay requirement in 1942. Like requiring employees to come to a workplace at the start of a shift without a guarantee of work, unpaid on-call shifts are enormously beneficial to employers: They create a large pool of contingent workers whom the employer can call on if a store's foot traffic warrants it, or can tell

---

enforcement manual that the "primary purpose" of the reporting time pay requirement is "to guarantee at least partial compensation for employees who expect to work a specified number of hours and who are deprived of that amount by the employer." The DLSE similarly noted in a 1978 manual, stating that the "primary purpose" of the reporting time pay requirement was to guarantee at least partial compensation "for employees who report to work expecting to work a specified number of hours, and who are deprived of that amount because of inadequate scheduling or lack of proper notice by the employer." However, as we have noted, the DLSE's interpretations "are not entitled to deference," and thus we will adopt them only if we independently determine they are correct. (See *Peabody v. Time Warner Cable, Inc.*, *supra*, 59 Cal.4th at p. 670.)

not to come in if it does not, without any financial consequence to the employers. This permits employers to keep their labor costs low when business is slow, while having workers at the ready when business picks up. It thus creates no incentive for employers to competently anticipate their labor needs and to schedule accordingly.

Like other kinds of contingent shifts, unpaid on-call shifts impose tremendous costs on employees. Because Tilly's requires employees to be available to work on-call shifts, they cannot commit to other jobs or schedule classes during those shifts. If they have children or care for elders, they must make contingent childcare or elder care arrangements, which they may have to pay for even if they are not called to work. And they cannot commit to social plans with friends or family because they will not know until two hours before a shift's start whether they will be available to keep those plans. In short, on-call shifts significantly limit employees' ability to earn income, pursue an education, care for dependent family members, and enjoy recreation time.

Further, because employees must contact Tilly's two hours before the start of on-call shifts, their activities are constrained not only during the on-call shift, but two hours before it as well. That is, at the time employees are required to call in to find out whether they will be required to work on-call shifts, they cannot do things that are incompatible with making a phone call, such as sleeping, watching a movie, taking a class, or being in an area without cell phone service. For example, consider an employee who has been scheduled for an on-call shift from 10:00 a.m. to 12:00 p.m., followed by a scheduled shift from 12:00 p.m. to 4:00 p.m. If Tilly's tells the employee at 8 a.m. that she is not

needed for the on-call shift, she will not be paid anything for that shift. Nevertheless, she will necessarily have forgone sleeping, working another job, taking a class, etc. *both* at 8 a.m. *and* between 10:00 a.m. and 12:00 p.m. In short, the employer will have imposed to some degree on *four hours* of the employee's time—an imposition for which it will not owe the employee any compensation.

For all of these reasons, we conclude that requiring reporting time pay for on-call shifts is consistent with the IWC's goals in adopting Wage Order 7. Reporting time pay requires employers to internalize some of the costs of overscheduling, thus encouraging employees to accurately project their labor needs and to schedule accordingly. Reporting time pay also partially compensates employees for the inconvenience and expense associated with making themselves available to work on-call shifts, including forgoing other employment, hiring caregivers for children or elders, and traveling to a worksite. Finally, reporting time pay makes employee income more predictable, by guaranteeing employees a portion of the wages they would earn if they were permitted to work the on-call shifts.

Tilly's urges that reporting time pay for on-call shifts is inconsistent with the IWC's intent, which it characterizes solely as " 'compensat[ing] the employee for transportation costs and loss of time.' " Tilly's contends that "making a phone call to check one's schedule is not something that the IWC intended to compensate, since it does not involve transportation costs or loss of time in the same way that actually reporting for work does." There are several problems with Tilly's analysis, most significantly that it reads one of the IWC's primary purposes— "encourag[ing] proper notice and scheduling"—out of the

legislative and regulatory history.  As we have said, the IWC identified its intention to encourage proper notice and scheduling when it first adopted a reporting time pay requirement in 1943, and it reiterated those concerns subsequently.

Moreover, while time spent commuting to work undoubtedly was one of the things the IWC had in mind when it referred to "loss of time," it was not the only one.  Indeed, had the IWC intended to compensate employees *only* for commuting time, it logically would have keyed reporting time pay to distance traveled, such that employees who lived greater distances from work would receive more reporting time pay than employees who lived closer to work.  Instead, the IWC tied reporting time pay not to an employee's commuting time, but to the length of the shift the employee was expecting to work.  Significantly, it also allowed reporting time pay of up to four hours—an amount far in excess of the time it takes most employees to commute to and from work.  And, as we have said, it specifically declined to limit reporting time pay for employees who resided at the workplace, who thus "do[] not lose the usual time going to and from the place of employment."  (IWC meeting mins. (Feb. 5, 1943) p. 6.)  This suggests that the "loss of time" the IWC was concerned about was not solely commuting time, but also lost work time and the accompanying loss of income.

Further, the contingent nature of an on-call shift means that some employees—namely, those who commute more than two hours to work—will incur transportation costs notwithstanding the two-hour window.  Employees who must commute more than two hours, either because they cannot afford housing close to work or must rely on public transportation to get to work, will have to begin traveling to work before they know

24

whether they will actually work their on-call shifts, thus incurring both transportation expenses *and* lost commuting time. And, even employees whose commute is less than two hours may have to begin readying themselves for work (ironing a uniform, dressing for work, etc.) before they know whether they will work on-call shifts.

Finally, Tilly's suggestion that reporting time pay was intended only to compensate employees for travel time and expense also cannot be squared with the exception in the reporting time pay provision for shifts cancelled for reasons beyond the employer's control. This exception makes sense only if reporting time pay was intended to impose a penalty for overscheduling—*not* if reporting time pay was intended only to compensate employees for travel time and expense. Put simply, employees' travel time and expenses are not reduced because the employer has a good reason for canceling a shift.

Based on the foregoing, we conclude, contrary to the trial court, that an employee need not necessarily physically appear at the workplace to "report for work." Instead, "report[ing] for work" within the meaning of the wage order is best understood as presenting oneself *as ordered.* "Report for work," in other words, does not have a single meaning, but instead is defined by the party who directs the manner in which the employee is to present himself or herself for work—that is, by the employer.

As thus interpreted, the reporting time pay requirement operates as follows. If an employer directs employees to present themselves for work by physically appearing at the workplace at the shift's start, then the reporting time requirement is triggered by the employee's appearance at the job site. But if the employer directs employees to present themselves for work by logging on to

a computer remotely, or by appearing at a client's job site, or by setting out on a trucking route, then the employee "reports for work" by doing those things.  And if, as plaintiff alleges in this case, the employer directs employees to present themselves for work by telephoning the store two hours prior to the start of a shift, then the reporting time requirement is triggered by the telephonic contact.[10]

## IV.
## Reporting Time Pay for On-Call Shifts Is
## Consistent With Supreme Court Authority

Our conclusion that employees may be owed reporting time pay for on-call shifts is consistent with our Supreme Court's recent decision in *Augustus*, *supra*, 2 Cal.5th 257.  The plaintiffs in that case were security guards who were required to keep their pagers and phones on during 10-minute rest breaks and to respond to calls as needed.  (*Id*. at p. 260.)  Plaintiffs sued, asserting that by requiring them to remain on-call during breaks, the employer was not providing them with true "rest" breaks.  The trial court granted the plaintiffs' motion for summary adjudication, concluding that "an on-duty or on-call break is no break at all."  (*Id*. at p. 261.)  The Court of Appeal disagreed and

---

[10]     Our conclusion is consistent with Tilly's examples that an attorney may "report" (appear) telephonically at the time of a hearing, but a prisoner must "report" (surrender) in person.  The relevant distinction is not, as Tilly's suggests, *when* the individual reports, but whether he does so *in the manner directed*.  That is, an attorney may appear telephonically if (and only if) the court has given him or her permission to do so; prisoners must surrender in person because they have been so instructed.

26

reversed, concluding that " 'simply being on call' " is not inconsistent with a period of rest. (*Id.* at p. 262.)

The Supreme Court granted review and reinstated the grant of summary adjudication for the security guards. It observed that applicable law required hourly employees be provided "rest periods," but it did not define the term. Nonetheless, the court said, "one cannot square the practice of compelling employees to remain at the ready, tethered by time and policy to particular locations or communications devices, with the requirement to relieve employees of all work duties and employer control during 10-minute rest periods." (*Augustus*, *supra*, 2 Cal.5th at p. 269.) The court explained: "Although Wage Order 4[11] is silent as to on-call rest periods, our construction of [the rest period requirement] cannot be reconciled with permitting employers to require employees to remain on call. As we explained, a rest period means an interval of time free from labor, work, or any other employment-related duties. And employees must not only be relieved of work duties, but also be freed from employer control over how they spend their time. [Citation.] . . . . [¶] . . . [¶]

". . . Whatever else being on call entails in the context of a required rest break, that status compels employees to remain at the ready and capable of being summoned to action [citation].

---

[11]    *Augustus* concerned Wage Order 4, which governs individuals employed "in professional, technical, clerical, mechanical, and similar occupations." (Cal. Code Regs., tit. 8, § 11040, subd. (1).) Wage Order 4 and Wage Order 7 have identical rest period and reporting time pay requirements. (Compare 8 Cal. Code Regs., § 11040, subds. (5), (12), and § 11070, subds. (5), (12).)

27

Employees forced to remain on call during a 10-minute rest period must fulfill certain duties: carrying a device or otherwise making arrangements so the employer can reach the employee during a break, responding when the employer seeks contact with the employee, and performing other work if the employer so requests. These obligations are irreconcilable with employees' retention of freedom to use rest periods for their own purposes. [Citation.]

"This very case provides an apt example. The trial court determined it was undisputed that [the employer's] policy required plaintiffs to keep radios and pagers on, remain vigilant, and respond if the need arose. Given these intersecting realities, on-call rest periods do not satisfy an employer's obligation to relieve employees of all work-related duties and employer control. In the context of a 10-minute break that employers must provide during the work period, a broad and intrusive degree of control exists when an employer requires employees to remain on call and respond during breaks. [Citation.] An employee on call cannot take a brief walk—five minutes out, five minutes back—if at the farthest extent of the walk he or she is not in a position to respond. Employees similarly cannot use their 10 minutes to take care of other personal matters that require truly uninterrupted time—like pumping breast milk (see [Labor Code] § 1030 [regarding use of break time for expressing milk for an infant]) or completing a phone call to arrange child care. The conclusion that on-call rest periods are impermissible is not only the most logical in light of our construction of Wage Order 4, subdivision 12(A), but is the most consistent with the protective purpose of the Labor Code and wage orders." (*Augustus*, *supra*, 2 Cal.5th at pp. 269–271.)

28

We recognize that *Augustus* addressed rest periods, not reporting time pay, and thus it does not control the case before us. It nonetheless is instructive. The court's holding in *Augustus* was grounded in its conclusion that if an employer limits the kinds of activities employees can engage in during off-duty time, they are not truly *off-duty*. That analysis plainly has resonance in this case, where, as we have described, the employer's on-call requirement limits how employees can use their off-duty time— and does so not merely for 10 minutes (during breaks which, by their nature, impose "practical limitations on an employee's movement" (*Augustus*, *supra*, 2 Cal.5th at p. 270)), but instead over several hours *before* and *during* on-call shifts. Indeed, as we have said, Tilly's call-in requirement imposes significant limitations on how employees can use their time both two hours before an on-call shift, when they must be available to contact Tilly's, and during the on-call shift itself, when employees must be available to work. As such, the call-in requirement is inconsistent with being off-duty, and thus triggers the reporting time pay requirement.

## V.
## Tilly's Public Policy Arguments
## Are Not Persuasive

Notwithstanding the foregoing, Tilly's suggests that requiring reporting time pay for on-call shifts is unworkable and will have absurd unintended consequences. These claims are without merit.

First, Tilly's suggests that if calling in two hours before an on-call shift triggers reporting time pay, employers will have to pay employees who are told to come to work but then fail to show up. Tilly's urges: "Consider the case of an employee who calls at

29

8 a.m. and learns he is expected to work at 10 a.m., but who is sick that day or for some other reason does not actually go to the store for work.  According to Appellant, that employee has nevertheless 'reported for work,' simply because the employee made the phone call. . . .  [¶] . . . [¶]  Appellant's interpretation of the Wage Order thus leads to absurd results:  if calling in advance qualifies as reporting for work, then the employee is free to be absent from work at the start of his shift and still receive reporting-time pay."

Tilly's contention rests on a misreading of the statutory language.  Wage Order 7 requires reporting time pay if an employee "is required to report for work and does report, *but is not put to work* or is furnished less than half said employee's usual or scheduled day's work." (Cal. Code Regulations., tit. 8, § 11070, subd. 5(A), italics added.)  In other words, an employee is owed reporting time pay only if upon reporting for work, she is denied the opportunity to work.  In Tilly's example, the employee was *not* denied the opportunity to work—to the contrary, she was directed to work the on-call shift.  She thus has no colorable claim to reporting time pay.

Second, Tilly's suggests that if on-call shifts trigger reporting time pay, the employees will be entitled to compensation merely for ascertaining their schedules—something Tilly's says has never been compensable.  Tilly's frames the issue this way:  "Employees undoubtedly must ascertain when they are supposed to work. . . .  Sometimes schedules will be posted weeks or days in advance.  And sometimes, as here, employees will not know their schedules until they call in, either two hours beforehand or the day before.  No matter how far in advance it takes place, however, the act of

30

ascertaining one's working schedule does not constitute reporting for work."

Tilly's assertion is partially correct:  Employers do not trigger reporting time pay requirements merely by expecting employees to apprise themselves of their schedules.  It goes without saying that an employee cannot arrive at work on time without knowing when his or her shift begins.  But as pled in plaintiff's complaint, Tilly's did not merely require employees to check their schedules as a necessary predicate to getting to work on time—it required employees to call in exactly two hours before the start of on-call shifts, and it "treat[ed] calling in late for an on-call shift or failing to call in for an on-call shift the same as missing a regularly scheduled shift."  In other words, under Tilly's on-call regime, failing to call in two hours before an on-call shift was an independent disciplinary offense, separate and apart from not coming to work on time.  As such, Tilly's call-in procedure required far more of employees than merely "ascertain[ing] when they are supposed to work," and thus it properly triggered the reporting time pay requirement.

Third, Tilly's contends that permitting employees to earn reporting time pay for calling in prior to the start of a shift is unworkable because "there is no limit to how far in advance of a shift an employee might 'report for work' . . . .  If [an employee] called in two days before, or three days before, or a week before, or two weeks before, in each case she would be performing exactly the same act:  ascertaining by phone, in advance of a shift, whether to actually report for it."  In so urging, Tilly's attacks a straw man because it is the *employer*, not the employee, who

31

directs how employees report for work.[12]  As we have said, we do not hold that employees are entitled to reporting time pay *whenever* they contact their employer to determine what their schedule is.  We hold *only* that if, as plaintiff alleges in this case, the employer requires the employee to call in two hours before the start of a shift, and the employee does so but "is not put to work or is furnished less than half said employee's usual or scheduled day's work," then the employer is liable for reporting time pay.

Fourth, Tilly's contends that applying Wage Order 7 to on-call shifts is unworkable because the regulation does not specify how much advance notice employees must be given to avoid a reporting time penalty.  We agree that the wage order potentially creates some difficult line-drawing challenges, but we need not resolve all of those challenges to answer the limited question before us:  whether the particular labor practice Tilly's is alleged to have engaged in implicates the reporting time pay provision of Wage Order 7.  (E.g., *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 316, fn. 1 ["we do not resolve abstract questions of law but rather address only issues that 'are presented on a factual record' "].)[13]

---

[12]   The so-called "absurd outcomes" amicus posits miss the mark for the same reason.  As we have said, the reporting time pay requirement is triggered when an employee calls *at the employer's direction* to confirm an on-call shift.  It is not triggered "*anytime* an employee . . . call[s]-in or otherwise check[s] [his or her] schedule."

[13]   Indeed, the need to draw the kinds of lines Tilly's suggests, by determining how much advance notice is necessary to avoid a reporting time penalty, may never be before a court for the

Finally, both Tilly's and amicus make much of the California Legislature's recent consideration of predictive scheduling bills, which would require employers to pay employees one hour of pay for each shift change made with less than one week's notice, and two hours or four hours of pay for each shift change made with less than 24 hours' notice or for each on-call shift for which the employee is required to be available but is not called in to work.  (See Assem. Bill No. 357 (2015–2016 Reg. Sess.); Sen. Bill No. 878 (2015–2016 Reg. Sess.).)  Tilly's and amicus contend that these predictive scheduling bills would have been entirely unnecessary if on-call shift pay were already required by wage order.  We do not agree.  The proposed legislation went further than the reporting time pay provision of Wage Order 7, requiring employees to be compensated for most schedule changes made with less than a week's notice.  Thus, although the proposed legislation would have compensated employees for on-call shifts, its reach was far broader.  Moreover, as the parties have noted, lower courts have split over the applicability of Wage Order 7 to on-call shifts, with at least one federal district court (as well as the trial court in this case) concluding that reporting time pay was not owed for call-in

---

simple reason that employers may not find four-hour, or eight-hour, or 24-hour call-in shifts economically desirable.  That is, two-hour call-in periods give employers flexibility to match the size of the work force to the number of customers in a store at any given time.  A longer call-in period likely would not be similarly advantageous from an employer's point of view because it is not clear that employers would be better able to predict staffing needs eight hours before a shift than they would, say, a week before a shift.

33

shifts.[14]  In light of this uncertainty, it is unsurprising that legislators included on-call shift pay as part of broader predictive scheduling legislation.  Their decision to do so, however, tells us nothing about the meaning of existing law.  Indeed, as Tilly's concedes, " '[u]npassed bills, as evidence of legislative intent, have little value.' " (*Apple Inc.*, *supra*, 56 Cal.4th at p. 146.)

---

[14]  See *Casas*, *supra*, 2014 WL 12644922, p. 5 [employee " 'report[s] for work' " only by "actually, physically show[ing] up at the workplace"]; *Bernal v. Zumiez, Inc.* (E.D. Cal. Aug. 17, 2017) 2017 WL 3585230, p. 3 [telephonically calling in "falls under the ambit of activity enforceable by the wage order"]; *Segal v. Aquent LLC* (S.D. Cal., Sep. 24, 2018, No. 18cv346-LA) 2018 WL 4599754 [adopting *Bernal*'s analysis].

## DISPOSITION

The judgment of dismissal and order sustaining the demurrer are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. Plaintiff is awarded her appellate costs.

**CERTIFIED FOR PUBLICATION**

EDMON, P. J.

I concur:

DHANIDINA, J.

**EGERTON, J., Concurring and Dissenting.**

I agree we must remand the case for plaintiff and appellant Skylar Ward to pursue a single theory against defendant and respondent Tilly's Inc.: that she reported for work, in person, but was sent home before her add-on shift and not paid. I otherwise respectfully dissent. The legislative history of the phrase "report for work" reflects the drafters' intent that—to qualify for reporting time pay—a retail salesperson must physically appear at the workplace: the store. As one federal judge has observed, our "fundamental task in interpreting Wage Orders is ascertaining the drafters' intent, not drawing up interpretations that promote the Court's view of good policy." (*Casas v. Victoria's Secret Stores, LLC* (C.D.Cal., Dec. 1, 2014, No. CV 14-6412-GW) 2014 WL 12644922, at *5 [nonpub. opn.] (*Casas*).) It is our Legislature's responsibility to enact any necessary legislation to address any hardship to employees who are required to call their employers to discover if they must report for work.

A.    *Ward's First Amended Complaint*

Ward's first amended complaint alleges three kinds of what she terms "on-call shifts": (1) Tilly's schedules the employee for a regular shift followed by an on-call shift. The employee must physically come to work for her regular shift; Tilly's then tells her "during her regular shift whether she also will be required to work her on-call shift." (2) Tilly's schedules the employee for a regular shift preceded by an on-call shift. The employee must contact Tilly's two hours before the on-call shift would start (or by 9:00 p.m. the night before if the on-call shift is scheduled for 10:00 a.m.) to find out if she must work the on-call shift—in other words, if she must come to work two hours before her regular shift. (3) Tilly's schedules the employee for an on-call shift on a

1

day she otherwise is not scheduled to work.  The employee must contact Tilly's two hours before the on-call shift would start (or by 9:00 p.m. the night before if the on-call shift is scheduled for 10:00 a.m.) to find out if she must work the on-call shift.

> B. *On-call Shifts for Which the Employee Never Actually Reports in Person*

A version of types two and three of the on-call shifts Ward alleges was at issue in *Casas*.  There, the plaintiffs alleged their employer, a clothing retailer, scheduled them for "call-in shifts." The employer required employees to call in two hours before the shift to find out if they had to report.  The retailer moved to dismiss the lawsuit and the court—United States District Judge George Wu—granted the motion.  Judge Wu concluded, "[C]all-in shifts do not trigger reporting-time penalties, even if the scheduling practice is inconvenient and employee-unfriendly." (*Casas*, *supra*, 2014 WL 12644922, at *1–2.)

Judge Wu noted the parties read the phrase "report for work" differently.  The court stated, "[V]arious dictionaries agree that the verb 'report' means, at least, 'to present oneself.' "  After discussing definitions of "report" and "present" in five different dictionaries, Judge Wu concluded, "Viewed in context, then, the plain meaning of the word 'report' supports [the retailer's] interpretation—that a person 'reports to work'[1] by physically showing up at the place ready to work."  (*Casas*, *supra*, 2014 WL 12644922, at *3.)

---

1  Judge Wu sometimes quoted the wage order as using the phrase "report to work" rather than "report for work."  The court focused more on the meanings of the words "report" and "to present oneself" than on any difference between the prepositions "for" and "to."

2

Judge Wu then turned to the legislative history of the wage order. The court noted an earlier version of the wage order, adopted in June 1947, used the phrase "report for work" this way: "No woman employee shall be required to *report for work* or be dismissed from work between the hours of 10 p.m. and 6 a.m. *unless suitable transportation is available*." (*Casas, supra*, 2014 WL 12644922, at *4, citing Docket No. 27-1, Ex. D, IWC Wage Order No. 7 R (effective June 1, 1947) [at 91 § 3(c)].) Judge Wu observed "[t]hat same 1947 Wage Order also included language almost identical to the current reporting-time provisions, stating: 'Each day an employee is *required to report for work and does report*, but is not put to work or is furnished less than half the usual day's work, said employee shall be paid for half the usual day's work at the employee's regular rate of pay, which shall be not less than the minimum wage herein provided.'" The court continued, "A basic rule of statutory construction states that identical words or phrases used in the same statute bear the same meaning, particularly where they appear in close proximity." (*Id*. at *4.) Judge Wu also cited minutes of a 1942 IWC meeting, concluding, "The legislative history therefore strongly suggests that, at least in 1947, the phrase 'report to work' meant physically showing up." (*Ibid*.)

Judge Wu continued, "Nothing in the legislative history indicates that the IWC ever altered this meaning. Indeed, the phrase '[e]ach day an employee is required to report for work and does report' has remained unchanged throughout later versions of the Wage Order. This consistency strongly suggests that the IWC intended the phrase 'report for work' to have the same meaning as in prior orders." (*Casas, supra*, 2014 WL 12644922, at *5.) Judge Wu stated, "This legislative history is entirely

3

consistent with the Court's earlier plain-meaning interpretation and essentially ends the discussion. The ordinary meaning of the phrase 'report for work' is to actually, physically show up." The court noted, "The fundamental task in interpreting Wage Orders is ascertaining the drafters' intent, not drawing up interpretations that promote the Court's view of good policy." (*Ibid.*)

Finally, Judge Wu observed that the retailer's "call-in scheduling policy is somewhat unfriendly to employees and disrespects their time." The court noted that policy "may make it harder to attract quality employees" and "result in high turnover." But, Judge Wu concluded, "the Wage Order's reporting-time provisions do not provide a remedy." (*Casas*, *supra*, 2014 WL 12644922, at \*6 & fn. 6.)

Judge Wu's opinion is thorough, well-reasoned, and sensible. I would follow it.

In addition to the "suitable transportation" language Judge Wu discusses, other legislative history supports the conclusion that, by "report[ing] for work," the wage order's drafters meant showing up in person. In 1943, the IWC enacted a reporting time pay provision for employees who "report for work." The IWC explicitly found the reason for paying reporting time premiums is to "compensate the employee for transportation costs and loss of time." (IWC meeting mins. (Apr. 5, 1943) ¶ 16, p. 34.) Other IWC actions from the early 1960s to the late 1970s were consistent with this intent. (See, e.g., Cal. Dept. of Industrial Relations, Div. of Industrial Welfare, Enforcement Manual (Oct. 1965) ¶ 418 (referring to Wage Order No. 14) [by enacting reporting time pay provision, IWC was attempting to "guarantee

the worker some earnings for making the trip to the place of employment"].)

There is more, much more. The legislative history consumes some 18,000 pages. But discussions of legislative history can waterlog the most buoyant reader. Suffice it to say here that no objective reader can study this complete legislative history and disagree with Judge Wu.

Ward relies on a different unpublished federal case decided not quite three years later, *Bernal v. Zumiez, Inc.* (E.D.Cal., Aug. 17, 2017, No. 2:16-cv-01802-SB) 2017 WL 3585230 [nonpub. opn.] (*Zumiez*).[2] As did *Casas*, *Zumiez* seems to concern a version of types two and three of the on-call shifts at issue here. The plaintiffs in *Zumiez* alleged their employer required them "to call in prior to regularly scheduled shifts three or four times a week" to find out if they had to come in to the store. (*Zumiez, supra,* 2017 WL 3585230, at *1.) The court (United States District Judge Stanley A. Bastian) stated the issue as whether " 'report[ing] for work' means physically coming to the workplace" or, instead, "if telephonic reporting is sufficient for reporting time pay to inure." (*Id*. at *2.) The court noted, "The case becomes a question of statutory interpretation: does the wage order require workers to physically come to the workplace in order to report?" (*Id*. at *3.)

---

[2]    That case now is on appeal in the United States Court of Appeals for the Ninth Circuit, No. 18-15135, after the district court certified its order for interlocutory appeal. The original plaintiff, Alexandra Bernal, dropped out of the case and the lead plaintiff now is Alexia Herrera. For clarity, I refer to the case as *Zumiez*. Oral argument is scheduled for February 4, 2019.

The *Zumiez* court "conclude[d] that a 'plain meaning' reading—one that applies a commonsense interpretation— supports the conclusion that telephonically calling in falls under the ambit of activity enforceable by the wage order." The court stated, "This legislative phrase [report for work] is facially unambiguous, and does not require a dictionary for interpretation." The court also found "no need for the Court to engage with the legislative history of the wage order." (*Zumiez*, *supra*, 2017 WL 3585230, at *3.) The *Zumiez* court said it "[took] notice of the order issued in [*Casas*]" (*id*. at *1), but the court did not discuss Judge Wu's reasoning or conclusions. Respectfully, the *Zumiez* opinion is an ipse dixit. It is unpersuasive.

In a third unpublished federal case, *Segal v. Aquent LLC* (S.D.Cal., Sept. 24, 2018, No. 18cv346-LAB) 2018 WL 4599754 [nonpub. opn.] (*Segal*), a federal district court in San Diego agreed with *Zumiez*, but asked the parties to "keep the Court apprised of developments" in the *Zumiez* appeal before the Ninth Circuit. (*Segal*, *supra*, 2018 WL 4599754, at *5 & fn. 3.) *Segal* was a putative class action against a Massachusetts "staffing" company, commonly known as a temp agency. Segal alleged Aquent hired individuals and "assign[ed] them out to companies looking to hire short-term workers." Segal alleged that Aquent's "recruiters misrepresented the number of hours [she] and her fellow employees would receive from their assigned companies" and that she "was required to 'report to work' [*sic*] via daily teleconference, regardless of whether there was work or not." (*Id*. at *1.) Like the *Zumiez* decision, the *Segal* opinion contains no analysis.

As this court has noted, in cases construing wage orders, "[o]ur task is to determine the Industrial Welfare Commission's

6

intent in promulgating the reporting time pay regulation. The rules of statutory construction apply to the interpretation of regulations." (*Price v. Starbucks Corp.* (2011) 192 Cal.App.4th 1136, 1145 (*Price*).) In my view, *Casas*—not *Zumiez*—correctly determined what it means to "report for work." I respectfully disagree with the *Zumiez* court that the phrase "report for work" is "facially unambiguous." The *Zumiez* court saw "no need" to consider the legislative history of the wage order. As Judge Wu noted in *Casas*, that legislative history supports Tilly's interpretation of the wage order's language.

The Division of Labor Standards Enforcement (DLSE), a division of the Department of Industrial Relations, is responsible for enforcing wage orders promulgated by the IWC. (*Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21, 25.) As recently as 2011, the DLSE stated that reporting time penalties are due only when "the employer finds it necessary to send the employee home because there is no work." (DLSE, Information Sheet: Wages et al. (Jan. 2011) <https://www.dir.ca.gov/dlse/Wages.pdf> [as of Feb. 4, 2019].) "While DLSE advice letters are not subject to the rulemaking procedures of the Administrative Procedure Act [citation], and thus have less force than regulations, courts follow them when they are persuasive." (*Hernandez v. Pacific Bell Telephone Co.* (2018) 29 Cal.App.5th 131, 143, citing *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584 (*Morillion*).)

Ward argues in her brief that the preposition "for" "is intended to convey purpose," in contrast with the preposition "to" which—Ward says—"is characterized by physical movement." Ward's counsel conceded at oral argument that, if the wage order used the phrase "report *to* work," that would "suggest" a "physical

7

presence" requirement. But, counsel said (notwithstanding the concession in his brief), Ward had not "analyzed that specific term." At least one federal court *has* interpreted the phrase "report to work" to mean physically reporting. *Culley v. Lincare Inc.* (E.D.Cal. 2017) 236 F.Supp.3d 1184 (*Culley*) was a putative class action. Plaintiff Christina Culley was a "healthcare specialist." She worked eight-hour shifts and was "also expected to be on-call certain evenings and weekends to handle customer issues that cropped up outside regular business hours." (*Id.* at p. 1187.) Lincare paid Culley for the time she actually worked on these after-hours customer issues, but Culley contended she was entitled to a full two hours' reporting time pay. Lincare contended Culley was entitled to this reporting time pay only "when she was required to leave her house to perform after-hours work," not when she was able to "resolve the customer's issue over the telephone." (*Id.* at p. 1189.)

The court concluded that, even though "the relevant regulations are to be construed liberally in favor of the employee," Lincare "ha[d] the better of the argument." The court said, "While [Culley] continually emphasizes the regulation's applicability to when an employee is required to 'work,' she wholly ignores the requirement that the employee **report** to work." (*Culley, supra,* 236 F.Supp.3d at p. 1190, original emphasis.) The court held that the reporting time pay requirement "applies only to occasions when [Culley] and class members were required to physically report to work and not to when they performed work via telephone." (*Ibid.*)

Tens of millions of dollars in potential employer liability should not turn on the difference between the prepositions "to" and "for." Indeed, leading treatises treat the two words as

interchangeable.  (See, e.g., Simmons, Wage and Hour Manual for Cal. Employers (21st ed. 2018) §§ 7.15, pp. 272–273, 8.13(b)(4), pp. 358–359 [using the terms "reporting-time pay," "reporting pay," and "show-up pay" as interchangeable; "[u]nder . . . the reporting-time pay requirements of the California Wage Orders, an employee may be paid a minimum of a specified number of hours' pay . . . when, after reporting to work at his scheduled starting time . . . he is not provided with the expected amount of work"]; 1 Wilcox, Cal. Employment Law (2018) Overview of Wage and Hour Laws, § 1.05[2][e], pp. 1-53−1-54 (Wilcox) [IWC wage orders cover a number of "facets of employment," including "[r]eporting time pay (minimum wages payable to employee who reports to work as required, but is not put to work or is furnished less than half the usual or scheduled day's work)"]; Advising Cal. Employers and Employees (Cont.Ed.Bar 2018) Wage and Hour Laws, § 5.15, p. 5-32 (CEB Advising California Employers) [reciting rule if employee "is required to report for work and does report" under heading "Pay for Reporting to Work"].)

Ward argues that even if, by "report for work," the IWC meant "physical attendance in the 1940s," we should redefine and expand that term because of "technological innovation."  That "technological innovation," Ward says, is the cellular telephone.  But there has been no technological change pertinent to proper statutory interpretation in this case.  Nothing turns on whether a cord or a cell tower connects the phone.  The notion that phones were unfamiliar in the 1940s is ahistorical:  spend some enjoyable time listening to Glenn Miller's 1940 hit *PEnnsylvania*

9

*6-5000.* (The Andrews Sisters' rendition is delightful.)[3]  When the Legislature defunded the IWC effective July 1, 2004,[4] cellular or mobile phones had been in use for some time. [5]

It is undoubtedly true—as Judge Wu noted—that the uncertainty of not knowing whether an employee will have to work an on-call shift can constitute a significant hardship to that employee.  I also assume employers like Tilly's have legitimate business reasons for needing the flexibility to schedule employees based on unexpected surges or lulls in customers, absences of other employees due to illness or family emergencies, and the like.  It would be surprising if retailers maintain on-call policies just to torture employees.  Balancing these competing needs and interests of employers and employees is a task for the Legislature, not this court.  The Legislature can give notice to all interested parties, learn the social costs and benefits of various alternatives, and engineer compromises acceptable to all.  We cannot.

Indeed, our Legislature considered predictive scheduling legislation as recently as 2016.  In 2015 and 2016, the California

---

[3]    The first automated dial exchanges in the Bell System were deployed in 1919.  (Engber, *Who Made That?:  Dial Tone* (Jan. 10, 2014) The New York Times Magazine  <https://www.nytimes.com /2014/01/12/magazine/who-made-that-dial-tone.html> [as of Feb. 4, 2019] (Engber article).)

[4]    *Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 434, fn. 2.

[5]    As of 2003, according to the U.S. Census Bureau, 94 percent of U.S. households had landlines and 63 percent had cell phones.  (Engber article, *supra*.)

10

Assembly took up the proposed "Fair Scheduling Act of 2015," Assembly Bill No. 357 (AB 357).  AB 357 would have provided for certain calculations of pay depending on how much notice the employer gave the employee.  (Assem. Bill No. 357 (2015–2016 Reg. Sess.) § 3(c)(1)–(3).)  The California Senate considered a similar bill, Senate Bill No. 878 (SB 878), the proposed "Reliable Scheduling Act of 2016."  Like AB 357, SB 878 would have calculated the amount of pay required based on the amount of notice the employer gave the employee.  (Sen. Bill No. 878 (2015–2016 Reg. Sess.) § 1(e)(1)–(2).)

In 2014, the San Francisco Board of Supervisors enacted an ordinance entitled, "Predictable Scheduling and Fair Treatment for Formula Retail Employees Ordinance."  (San Francisco Ordinance No. 241-14.)  The ordinance applies to businesses that employ 20 or more individuals in the city of San Francisco and "have at least 20 retail establishments located worldwide." (*Id.*, § 3300G.1.)  The ordinance requires employers to post work schedules at least two weeks in advance.  (*Id.*, § 3300G.4, subd. (b).)  An employer must pay an employee one hour of pay if it changes the schedule 24 hours or more but fewer than seven days in advance.  (*Id.*, § 3300G.4, subd. (c)(2)(A).)  The ordinance also provides for payments of two or four hours for changes or cancellations to scheduled or on-call shifts depending on the amount of notice and the shift's length.  (*Id.*, § 3300G.4, subd. (c)(1)(B), (C).)  The ordinance contains a number of exceptions, including the unexpected unavailability of another employee when the employer did not receive at least seven days' notice, the failure of another scheduled employee to show up, employees' trading of shifts, and mandatory overtime.  (*Id.*, § 3300G.4, subd. (e).)

How are we—an appellate court limited to the narrow record before us—to determine how much notice is enough to avoid a violation of the wage order? What if employees are required to call in eight hours in advance instead of two? How about 12 hours? Twenty-four? Three days? A week? At oral argument, Ward's counsel seemed to offer a concession that a requirement employees call in 24 hours in advance would be legal. But a concession by one attorney in one case cannot bind all of the plaintiffs' lawyers across the state who might choose to file similar lawsuits.

And what about a situation in which an on-call employee is needed to come in to the store because another employee called in sick, or has a family emergency, or just didn't show up? Does the rule we announce today apply to all retailers in our state of 40 million people, regardless of how many employees or locations it has? Does it apply to almost every other industry in our state? Fifteen of California's 18 wage orders[6]—governing everything from manufacturing to transportation to "amusement and recreation" to "handling products after harvest"—contain the identical phrase: to report for work.

The conclusion that the legislative intent of those who wrote Wage Order No. 7-2001 was not to require payment to employees who are required merely to call their employer to learn whether they must "report for work" should—to quote Judge Wu—end the discussion. As a court, our fundamental task in interpreting this wage order "is ascertaining the drafters' intent,

---

[6] *Gerard v. Orange Coast Memorial Medical Center* (2018) 6 Cal.5th 443, 448; CEB Advising California Employers, *supra*, § 5.3, pp. 5-8–5-9.

not drawing up interpretations that promote the Court's view of good policy." (*Casas, supra,* 2014 WL 12644922, at \*5.) Any needed fix is the responsibility of our Legislature.

C.  *On-call Shifts for Which the Employee Physically Reports in Person But Is Sent Home After Her Regular Four-hour Shift*

Type one of the on-call shifts alleged in this case requires a different analysis. As noted, in that version of Tilly's practice, "[e]mployees are scheduled for a regular shift as well as an on-call shift later that same day. In such instances the employee is required to physically show up for work at the time of her regular shift and is told during her regular shift whether she will also be required to work her on-call shift." Ward seeks to sue on behalf of a subclass of employees "who:  (a) were scheduled for a regular shift immediately followed by an on-call shift that same day; (b) physically reported to work by working their regular shift; and (c) were not paid the greater of two hours at their regular rate of pay and one-half of their scheduled day's work at their regular rate of pay."

So according to the allegations of Ward's first amended complaint, she *did* physically report to work but was sent home after her regular shift, and not permitted to work her two-hour add-on shift, without any compensation. The trial court's order sustaining Tilly's demurrer did not discuss this version of the on-call policy. Tilly's counsel—who drafted the proposed order for the court's review—included several paragraphs regarding the on-call-shift-following-scheduled-shift type of arrangement, but the trial court marked them out. The trial court's conclusion—"by merely calling in to learn whether an employee will work a call-in shift, Plaintiff and other employees do not report to [*sic*] work as

13

contemplated by Wage Order 7[-2001]"—by its terms does not cover type one of Tilly's on-call practice.

On appeal, Tilly's never explains why this practice is not unlawful under the wage order as a situation in which the employee "is required to report for work and does report, but is not put to work . . . ." Under most or all of the IWC's wage orders, "if an employee is required to report for work a second time on any one workday and is furnished less than two hours of work on the second reporting, the employee shall be paid for two hours at the employee's regular rate of pay." (Wilcox, *supra*, Overtime and Regulation, § 3.01[5][b], pp. 3-20−3-21.) Ward alleges she did show up, in person, prepared to work an add-on shift at the conclusion of her scheduled shift, but was sent home and not permitted to work the add-on shift.

All that Tilly's has to say on this subject appears at page 45 of its brief: "Under existing California law, employers are and always have been free to extend employees' shifts before they end." Tilly's cites no authority for this assertion. When asked about this at oral argument, Tilly's counsel said only that employers have "every right without any notice" to require employees to stay for additional hours after the end of their shifts, and that there is no statute or regulation prohibiting them from doing so. But there is a difference between an employer occasionally extending an employee's workday so that she must continue to work past the time her shift is scheduled to end, and a routine practice of requiring employees to work 50 percent more time—two hours added on to a four-hour shift—with at most a few hours' notice.

14

## D. Retroactivity

Finally, in any event, our interpretation of the wage order's "report for work" language should be prospective only. Both Ward and Tilly's insist the language of the wage order is absolutely clear. But their readings of this "absolutely clear" language are 180 degrees apart. Two federal judges have read the same three words to mean opposite things. Wage Order No. 7-2001 has been on the books for more than 70 years. Neither the Division of Labor Standards Enforcement nor the Division of Industrial Welfare Enforcement ever has filed any charge or initiated any action against an employer for an "on-call" policy. The DLSE "is the state agency authorized to interpret and enforce California's labor laws." (*Price, supra,* 192 Cal.App.4th at p. 1146, fn. 10.) As noted, the DLSE's interpretation of the wage order has been in accord with Tilly's reading of the language: that "report for work" means actually showing up. "Although not binding on a court, the DLSE's construction is entitled to consideration and respect." (*Ibid.*; see also *Morillion, supra,* 22 Cal.4th at p. 584.) None of the three leading treatises cited—all updated as of 2018—even mentions the issue. Until August of 2017, when a federal district court in Sacramento issued its unpublished opinion, no court ever had held such an "on-call" policy to be unlawful.

## E. Conclusion

Proper public policy about on-call shifts is complex. Retailers face inevitable uncertainty: weather, traffic, inventory gluts and shortages, and marketing responses all affect the number of customers who may appear on a given day. Some efficient businesses would like to staff with flexibility. This is

15

less an issue of management competence than it is of grappling with market unpredictability.

The question is legislative. California is blessed with an active, informed, engaged, attentive legislature that is in session year-round. Our legislature can hold hearings to investigate the dimensions of this statewide situation. All interested parties can receive notice and an opportunity to be heard. Legislative compromises can be proposed, debated, adjusted, and revisited. This court can do none of that.

I would affirm the trial court's order sustaining Tilly's demurrer to Ward's first amended complaint except for the legal theory set forth in paragraph 25(a) of that complaint. I would have the parties bear their own respective costs on appeal.


EGERTON, J.